ACCEPTED
03-14-00698-CV
4771671
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/6/2015 1:43:30 PM
JEFFREY D. KYLE
CLERK

# CAUSE NO. 03-14-00698-CV

———————————————————————

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
4/6/2015 1:43:30 PM
JEFFREY D. KYLE
Clerk

## IN THE THIRD COURT OF APPEALS IN AUSTIN, TEXAS

———————————————————————

SHAMARK SMITH LIMITED PARTNERSHIP, ET AL.,

Appellants,

v.

MARTIN LONGORIA,

Appellee.

———————————————————————

On appeal from the 20th Judicial District Court of Milam County, Texas

———————————————————————

## APPELLANTS' BRIEF

———————————————————————


Tracy J. Willi
Texas Bar No. 00784633
Willi Law Firm, P.C.
9600 Escarpment Blvd., Suite 745, PMB 34
Austin, TX 78749-1983
Tel. (512) 288-3200
Fax (512) 288-3202
twilli@willi.com

ATTORNEY FOR SHAMARK SMITH
LIMITED PARTNERSHIP, SHARON D.
MARCUS, AND PAUL J. SMITH


ORAL ARGUMENT REQUESTED

# IDENTITY OF PARTIES AND COUNSEL

**Appellants:**

Sharon D. Marcus, an individual
Paul J. Smith, an individual
Shamark Smith Limited Partnership

**Appellate Counsel for Sharon D. Marcus, Paul J. Smith, and Shamark Smith Limited Partnership:**

Tracy J. Willi
Willi Law Firm, P.C.
9600 Escarpment Blvd., Suite 745, PMB 34
Austin, TX 78749
Tel. (512) 288-3200
Fax (512) 288-3202
twilli@willi.com

**Trial Court Counsel for Sharon D. Marcus, Paul J. Smith, and Shamark Smith Limited Partnership:**

Israel Garcia
Law Offices of Israel Garcia
Chulie Professional Building
926 Chulie Dr.
San Antonio, TX 78216
Tel. (210) 225-6666
Fax (210) 225-2300

Attorney for Sharon D. Marcus and Shamark Smith Limited Partnership

Paul J. Smith
Attorney at Law
651 S. Walnut, Suite D, #228
New Braunfels, TX 78130
Tel. (713) 271-2413
Fax (713) 237-0820

Attorney *pro se* at trial

**Appellee:**

Martin M. Longoria, an individual

**Appellate Counsel for Martin M. Longoria:**

James David Walker
P.O. Box 41
Milano, Texas 76556
Tel. (512) 636-9520
Fax (512) 455-7992
walker@2appeal.com

**Trial Counsel for Martin M. Longoria:**

Mickey Blanks
Blanks, Greenfield & Rhodes
P.O. Box 867
Temple, TX 76501-0867
Tel. (254) 778-4181
Fax (254) 778-1280

W.W. Torrey
P.O. Drawer 752
1105 N. Travis
Cameron, TX 76520
Tel. (254) 697-3700
Fax (254) 697-3702

## TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ........................................................ ii

INDEX OF AUTHORITIES.......................................................................... vii

STATEMENT OF THE CASE..........................................................................1

ISSUES PRESENTED .....................................................................................2

STATEMENT OF FACTS ................................................................................3

**I.      SUMMARY OF THE CLAIMS.**...............................................................3

**II.     LONGORIA FAILED TO PRESENT EVIDENCE OF RECOVERABLE DAMAGES.**.................................................................4

    **A.**   **No evidence of injury to reputation.**......................................5

    **B.**   **No evidence of mental anguish.**.............................................6

**III.    THE RECORD DEMONSTRATES THAT JURORS SHOULD HAVE BEEN STRUCK FOR CAUSE.**.........................................7

    **A.**   **The jury held the Shamark Parties to the higher standard of proof of "beyond a reasonable doubt."**.............................................7

    **B.**   **Jurors refused to find in favor of Shamark Parties' claims or defenses involving theft unless Longoria had been convicted of the crime.**...........................................................................12

    **C.**   **Challenges for cause were denied by the trial court.**......................13

    **D.**   **Attempted rehabilitation by opposing counsel was ineffective.** .........................................................................13

    **E.**   **Attempted rehabilitation by the Court was ineffective.** ................14

    **F.**   **The Shamark Parties had to use peremptory strikes against jurors who should have been struck for cause. Also, three jurors who should have been struck for cause were selected for the jury.**..........................................................................15

SUMMARY OF THE ARGUMENT ........................................................16

ARGUMENT ...............................................................................18

**I.    THE EVIDENCE IS LEGALLY AND FACTUALLY INSUFFICIENT TO SUPPORT ACTUAL DAMAGES. .........................18**

    **A.    Standard of review. ..............................................................18**

    **B.    Defamation was the gravamen of the complaint and the only basis for the jury's damages finding. Claims for intentional infliction of emotional distress and malicious prosecution were waived and do not support damages. .....................19**

    **C.    If more than nominal damages are awarded, then injury to reputation and mental anguish damages must be supported by evidence of actual injury. ...............................................20**

    **D.    Damages awarded for injury to reputation are not supported by the evidence. ...............................................................20**

    **E.    Damages awarded for mental anguish are not supported by the evidence. .........................................................................23**

**II.   NO ATTORNEY'S FEES AND NO EXEMPLARY DAMAGES MAY BE AWARDED. ................................................................25**

**III.  NO REMAND FOR A DETERMINATION OF NOMINAL DAMAGES. ...........................................................................28**

**IV.   THE TRIAL COURT ABUSED ITS DISCRETION BY REFUSING TO STRIKE JURORS CHALLENGED FOR CAUSE. ...................................................................................28**

**V.    CONCLUSION AND PRAYER. .................................................33**

CERTIFICATE OF COMPLIANCE ....................................................33

CERTIFICATE OF FILING AND SERVICE ........................................34

APPENDIX

Final Judgment dated August 15, 2014 (CR 1082–85) ....................................App. 1

Charge of the Court (CR 1031–59) .................................................................App. 2

*Burbage v. Burbage,*
     447 S.W.3d 249 (Tex. 2014) .................................................................App. 3

# INDEX OF AUTHORITIES

## Cases

*Bentley v. Bunton*,
    94 S.W.3d 561 (Tex. 2002) (plurality opinion) ...........................................20

*Buls v. Fuselier*,
    55 S.W.3d 204 (Tex. App.-Texarkana 2001, no pet.) ...................................30

*Burbage v. Burbage*,
    447 S.W.3d 249 (Tex. 2014) ......................................................1, 20–22, 27, 28

*Cain v. Bain*,
    709 S.W.2d 175 (Tex. 1986) ........................................................................19

*Hammerly Oaks, Inc. v. Edwards*,
    958 S.W.2d 387 (Tex. 1997) ........................................................................22

*Hancock v. Variyam*,
    400 S.W.3d 59 (Tex. 2013) ......................................................18, 20, 22, 27

*Hoffman-La Roche, Inc. v. Zeltwanger*,
    144 S.W.3d 438 (Tex. 2004) ...................................................................20, 25

*Holland v. Wal-Mart Stores, Inc.*,
    1 S.W.3d 91 (Tex. 1999) ..............................................................................25

*Hyundai Motor Co. v. Vasquez*,
    189 S.W.3d 743 (Tex. 2006) ...................................................................29, 30

*Intercont'l Grp. P'ship v. KB Home Lone Star, L.P.*,
    295 S.W.3d 650 (Tex. 2009) ........................................................................25

*Malone v. Foster*,
    977 S.W.2d 562 (Tex. 1998) ........................................................................29

*Mancorp, Inc. v. Culpepper*,
    802 S.W.2d 227 (Tex. 1990) ........................................................................25

*MBM Fin. Corp. v. Woodlands Operating Co., L.P.*,
    292 S.W.3d 660 (Tex. 2009) ........................................................................28

*Murff v. Pass*,
249 S.W.3d 407 (Tex. 2008) ...............................................................32

*Parkway Co. v. Woodruff*,
901 S.W.2d 434 (Tex. 1995) ...........................................................23, 24

*Plas-Tex, Inc. v. U.S. Steel Corp.*,
772 S.W.2d 442 (Tex. 1989) ...............................................................19

*Saenz v. Fidelity & Guar. Ins.*,
925 S.W.2d 607 (Tex. 1996) ...............................................................23

*Salinas v. Salinas*,
365 S.W.3d 318 (Tex. 2012) (per curiam) ..........................................20

*Shepherd v. Ledford*,
962 S.W.2d 28 (Tex. 1998) .................................................................29

*Siegler v. Williams*,
658 S.W.2d 236 (Tex. App.—Houston [1st Dist.] 1983, no writ) ..............27

*Smith v. Dean*,
232 S.W.3d 181 (Tex. App.—Fort Worth 2007, pet. denied) ....................30

*Standard Fruit and Vegetable Co. v. Johnson*,
985 S.W.2d 62 (Tex. 1998) .................................................................20

*Sullemon v. U.S. Fid. & Guar. Co.*,
734 S.W.2d 10 (Tex. App.—Dallas 1987, no writ) ...................................29

*Swap Shop v. Fortune*,
365 S.W.2d 151 (Tex. 1963) ...............................................................30

*Turner v. Turner*,
385 S.W.2d 230 (Tex. 1964) ...............................................................25

*Waste Management of Texas, Inc. v. Texas Disposal Systems Landfill, Ltd.*,
434 S.W.3d 142 (Tex. 2014) ...............................................................21

## Statutes and Rules

TEX. CIV. PRAC. & REM. CODE § 134.005.................................................................26

TEX. CIV. PRAC. & REM. CODE § 41.004(a) ...........................................................27

TEX. GOV'T CODE § 62.105(4) ...............................................................................29

TEX. R. CIV. P. 226a................................................................................................29

TEX. R. CIV. P. 278.................................................................................................19

# STATEMENT OF THE CASE

*Nature of the Case:* This case involves competing claims for conversion and trespass on one side and intentional infliction of emotional distress, criminal malicious prosecution, and defamation on the other side. The appeal focuses on whether the evidence supports damages for injury to reputation and mental anguish and whether jurors should have been struck for cause.

*Trial Court:* Hon. Jan Patterson, retired judge sitting by assignment, 20th Judicial District Court of Milam County, Texas.

*Trial Court's Disposition:* The trial court entered judgment on the verdict on August 15, 2015. CR 1082–85 (Judgment attached as App. 1).

# **ISSUES PRESENTED**

1. Did the trial court err in its award of damages, attorney's fees, and exemplary damages against Sharon D. Marcus, Paul J. Smith, and Shamark Smith Limited Partnership?

2. Did the trial court err by refusing to strike jurors that had been challenged for cause?

**STATEMENT OF FACTS**

## I.     SUMMARY OF THE CLAIMS.

This case was brought by Shamark Smith Limited Partnership ("Shamark") against Martin Longoria ("Longoria") for conversion and trespass.   CR 8–10. Shamark owns property with a house in rural Milam County.  Shamark asserted that Longoria trespassed onto Shamark's property and instructed his workers to dismantle the building and to steal various antiques and other items of value, such as the tin roof and valuable lumber, from the property.  Longoria counterclaimed against Shamark, Paul D. Smith, and Sharon D. Marcus (collectively referred to as the "Shamark Parties") for criminal malicious prosecution, intentional infliction of emotional distress, and defamation.  CR 17–20.  The crux of the case is whether Longoria had permission to dismantle the house or if Longoria entered without consent and stole several items of value from the property.

The jury found against Shamark on its claims of conversion and trespass.  CR 1034, 1036 (Charge of the Court attached as App. 2).  The jury found in favor of Longoria on his claims of criminal malicious prosecution, intentional infliction of emotional distress, and defamation.  CR 1045 (Question 12, intentional infliction of emotional distress); CR 1046 (Question 13, criminal malicious prosecution); and CR 1047–50 (Question 14, 15, 16, and 17, defamation).  The jury awarded damages based solely upon its finding of a published statement in Question 14 that, "Martin

3

Longoria had stolen components of or contents inside the Old Sneed Home." CR 1047, 1052. While the damages question was pre-conditioned on findings of "yes" to Questions 12 (malicious prosecution), 13 (intentional infliction of emotional distress), or 18 (clear and convincing evidence of falseness), Question 19 on damages requested the jury to determine damages linked directly and solely to Question 14, the finding that the statement of theft was published. *Id.*

## II. LONGORIA FAILED TO PRESENT EVIDENCE OF RECOVERABLE DAMAGES.

The jury awarded damages for injury to reputation in the past in the amount of $275,000 against Smith, Marcus, and Shamark divided as $90,000, $90,000 and $95,000 respectively. CR 1052. The jury awarded damages for injury to reputation in the future in the amount of $40,000 against Smith, Marcus, and Shamark divided as $10,000, $10,000, and $20,000 respectively. CR 1052. The jury further awarded mental anguish damages in the past of $75,000 against Smith, Marcus, and Shamark divided as $20,000, $20,000, and $35,000 respectively. CR 1053.

Question 8 requested the jury to determine whether Longoria or any of his agents committed theft of property valued at $20,000 or greater. CR 1041. The jury was instructed not to answer the question if it did not answer "yes" to Question 1. Since the answer to Question 1 was "no" the jury did not answer Question 8. *Id.* Question 11 was conditioned to be answered only if there was a "no" answer to Question 8. Nonetheless, in response to Question 11, the jury awarded attorney's

4

fees to Longoria in the amount of $163,000 for representation in the trial court, $30,000 for representation through appeal to the Court of Appeals, and $20,000 for representation through appeal to the Supreme Court of Texas. CR. 1044.[1] Question 11 was not based upon any other particular finding in the jury charge—it was not linked to any liability finding. *Id.* The attorney's fees cannot be based upon the answer to Question 8 on "theft" because the jury did not answer Question 8.

The jury further awarded exemplary damages for the conduct found in Question 20 (the harm to Longoria resulted from malice) or 21 (the harm to Longoria resulted from fraud) against Smith, Marcus, and Shamark in the amount of $100,000 divided as $30,000, $30,000, and $40,000 respectively. CR 1056.

Several legal arguments will be addressed to challenge the awards of exemplary damages and attorney's fees, but very basically, without evidence of actual damages, exemplary damages and attorney's fees are not recoverable.

### A. No evidence of injury to reputation.

Counsel for Longoria made it clear during trial that, "We are not asking for, nor are we seeking in the jury charge to recover any economic damages." RR Vol.

---

[1] The jury understood it was not requested to answer Question 11 since it did not answer Question 8 affirmatively or negatively. Nonetheless, when the jury sent out a question to the judge on whether they should answer Question 11, the judge instructed the jury to answer Question 11, but did not instruct the jury to answer Question 8. Supp CR 42. There is no legal basis for the jury to have answered Question 11 in this jury charge.

5

8, 203.  Longoria testified that the criminal case was dismissed and he was not even arrested – he simply turned himself in.  RR Vol. 8, 202.  Longoria testified that he cannot identify one person who told him that they would not hire him for reasons relating to the theft accusation or arrest.  RR Vol. 8, 202.  No one has ever told him that they would not hire him because of the arrest.  No one has ever told him that his reputation was damaged in any way.  RR Vol. 8, 213–14.

## B. No evidence of mental anguish.

Longoria has never been to any medical doctors, mental healthcare professionals, psychologists, therapists, or any psychiatric care for any kind of emotional distress.  RR Vol. 8, 214.  At best, his testimony was that he was merely worried about what could happen to him if he was found guilty.  RR Vol. 8, 214–15.  But the criminal action got no further than the grand jury, where it was no-billed— Longoria was never indicted.  RR Vol. 8, 215.  He complained of emotional distress from the financial concerns, but there was no evidence of financial hardship, and there was evidence that Longoria had substantial real property interests in Mexico.  RR Vol. 8, 215.  The level of emotional distress did not cause him any illness or physical symptoms.  RR Vol. 8, 215.  He testified that he is in a bad mood sometimes, but he can still get up and do his daily activities and it did not disrupt those daily activities.  RR Vol. 8, 216.

## III. THE RECORD DEMONSTRATES THAT JURORS SHOULD HAVE BEEN STRUCK FOR CAUSE.

### A. The jury held the Shamark Parties to the higher standard of proof of "beyond a reasonable doubt."

The record demonstrates that jurors 6, 8, 9, 10, 12, 13, 14, 24, 26, 31, 32, 33, 47, 49, 50, and 51 should have been struck for cause because they would require the Shamark Parties to prove that Longoria committed theft beyond a reasonable doubt rather than by a preponderance of the evidence.

MR. SMITH: Well, I don't mean to say it's nothing, okay. What I mean is if it will help, we're not going to be sentencing anyone to death.

VENIREPERSON: No, but you've got a man that's got to live the rest of his life of being accused of something that he may not have done.

MR. SMITH: And if he did it and you determine that he did do it, could you award money?

VENIREPERSON: Would -- run that by me again.

MR. SMITH: If the person that is accused is proved to your satisfaction that he did it and the people that lost what they lost prove how much it was worth, could you award money?

VENIREPERSON: Yeah, but it's going to be -- have to be beyond a shadow of a doubt.

MR. SMITH: And if the Judge instructs you that the burden of proof is not beyond shadow of a doubt but by a preponderance of the evidence, likely --

VENIREPERSON: (Moving head side to side.)

MR. SMITH: Can't do it. Okay, that's fair enough. Juror number...

VENIREPERSON: 50.

7

MR. SMITH:  Now, I can cut to the chase.  Does anyone else feel the same way, that the burden of proof must be beyond a reasonable doubt or a shadow of a doubt? Number 32.  Hold on.  Let me get -- and I need to make sure, okay. Please hold your cards up.  Number 6, number 9, number 11, number 12, number 13, number 14, 16, 32, 31, 30, 28, 26, 24, 23, 22, 21, 20, 17, 33, 34, 35, 36, 38, 40, 41, 42, 43, 47, 48, 49 and 50.  And you're number 29?  I don't believe I got it.  All right.  Second part.  How strongly do you feel that way?  What I mean by this is: I expect the Judge to give a different instruction, okay.  If your feeling is so strong that it won't matter to you what the Judge says as far as burden of proof, please keep your hand raised or your card raised.  If you can leave room for the possibility -- and that's juror number 50, number 24, number 9 and 50 and --

VENIREPERSON: Repeat the question, please.

MR. SMITH:  There were a number of us that said beyond a reasonable doubt, a shadow of a doubt to use Perry Mason.  I believe -- I think the other side believes that the burden of proof instruction will be different than from the Judge.  We believe as we believe and that's okay.  But in order to be a fair juror to both sides, you have to be able to follow the law.  And if it is such that regardless of what anyone says, it's still beyond a reasonable doubt or a shadow of a doubt, that's okay.

VENIREPERSON: But why is that okay?  If – you're either holding the smoking gun or you're not.

MR. SMITH: Because the law is as the Judge will instruct you, okay.  Not every case is a criminal case like on TV.  The levels -- let me give you an example. And this is the best example I can give.  In a football game, if the ball advances to the 50 yard line and one inch, in a civil case, the side that got the ball to the 50 yard line and one inch wins.  If in a criminal case, which this is not, you've got to get into the end zone to win, that's beyond a reasonable doubt.  Does that help?  It's the only analogy I know.

VENIREPERSON:  They don't play football that way, though. This is Texas. You have got to make it to the end zone to make a point.

MR. SMITH:  What would you use?

VENIREPERSON:  It sounds like a rounding game to me, the closest one to the winning side wins.

MR. SMITH:  I'm sorry?

VENIREPERSON:  It sounds like a rounding game, the closest within five wins.  That ain't fair.

MR. SMITH:  And that's okay if you don't believe that or can't follow that. That's perfectly fine.  It means in this particular type of case, that you would not be a fair juror to either side.  It doesn't mean you wouldn't be a great juror in, say, a criminal case or a child custody case where the burdens are different.  That's all I'm trying to get at. And I appreciate the brutal honesty of people, so many people holding their cards up. It's real important for us, it's important for them, it's important for the Judge, it's important for justice.  Because if the – the mistake or the belief that we have to prove all beyond every shadow of a doubt is not the law, justice has failed.  That's not what this courtroom is about and it's okay to believe as you believe.  So how many feel so strongly that no matter what is told, it still has to be beyond a shadow of a doubt to award money?  Would you please raise your cards.  And, Judge, I am not going to make notes.  I'm sorry, folks.  I know -- and this is the most perfect jury I have ever seen because there's brutal honesty here. Do you realize how important that is in justice?  It is so brutally honest and so important that people tell their truth no matter what and I appreciate you, sir.  It's okay, and I respect that.  Have we got all the numbers?

MR. GARCIA: Let me double check real quick.

MR. SMITH:  I'm sorry.  One more time.  I'm sorry but this is the crux of the case.  Are you in, too?  Got them?

MR. GARCIA:  Got them.

MR. SMITH:  Thank you all so much.  Now, having answered that question, I can begin to understand why when you honestly tell me you would not be a good juror, it's okay.  I accept that. In fact, I honor that and every one of you.  I honor that, telling your truth no matter what. So there's some people that are left.  Who did not raise their cards?

9

Could I see those that did not raise their cards? Judge, may we approach?

(Bench conference held outside the hearing of the jury panel.)

MR. SMITH: Your Honor, I don't want to waste a lot of the Court's time or the jury's time. I believe that that is the essence of the burden of proof is an instruction and I went through it very clearly. I counted the numbers left, and I believe there were 13 who could consider other than beyond a reasonable doubt or a shadow of a doubt. If we struck six, we would not have enough. I would respectfully request at this time, we move for a mistrial and that we re-impanel and these people can go home.

MR. BLANKS: It's all how he asked the question and he got a response to a question that I think the jury didn't understand; otherwise, if he was picking juries here, we would never have a jury impaneled in Milam County in civil cases. So his time is up; I think he should sit down and I should be allowed to clarify.

THE COURT: Whether you misspoke or not, you also said that the instruction would be different from that that the Judge gives you, that the law would be different than that that that the Judge gives you, and I don't know exactly what you meant by that. But I think it is in the way you asked the question. You need to -- we may be able to handle this in camera with individual jurors but you haven't accomplished your mission yet. So I am going to deny the motion. You have nine minutes.

MR. SMITH: May I ask them one last thing? What -- particularly -- the Court -- I mean, if it's -- the panel --

MR. TORREY: It's standard of proof, not burden of proof.

THE COURT: And you haven't explained what the burden of proof is, you haven't explained preponderance of the evidence and suggested that – one person said it would have to be beyond a shadow of a doubt and then you said -- you elicited anyone else from the juror's answer, so I don't think you've accomplished your striking for cause.

MR. SMITH: Okay. I'll go into --

10

MR. TORREY: I think that your voir dire is mostly incoherent, which adds to their --

THE COURT: You know, I --

COURT REPORTER: I'm having a hard time hearing.

THE COURT: You have nine minutes to complete and then you may make your -- any appropriate motion at the conclusion of the whole --

MR. SMITH: I didn't --

THE COURT: -- voir dire. Please continue.

MR. SMITH: Sure.

(Open court, and all counsel and parties present.)

Burden of proof. The term "preponderance of the evidence," which I believe that the Judge will instruct you in this case to be the guiding process by which you decide your verdict means the greater weight of credible evidence admitted in this case. A preponderance of evidence is not measured by the number of witnesses or the number of documents admitted into evidence. For a fact to be proved by a preponderance of the evidence, you must find the fact is more likely true than not. Do I -- does everybody understand that?

(No response.)

So earlier I hope that I didn't misspeak. I may have. This case is on preponderance of the evidence. It doesn't mean 100 percent or beyond a reasonable doubt and I gave a horrible football analogy, okay. Now, having given the definition that I believe the Judge will give you, can you decide this case on preponderance of the evidence, or are you going to require a different, higher burden of proof for us as the people bringing the initial lawsuit? Does that help any? So can you please raise your hand if you require a higher burden of proof, a number. Okay. And I want to get these. Number 6, 8, 9, 10, 12, 13, 14, 32, 31, 26, 24, 33, 49, 50 and 51 and 47. Did I get you? 47. That's what I need and it's okay. It's okay.

RR Vol. 4, 95–103.

11

**B. Jurors refused to find in favor of Shamark Parties' claims or defenses involving theft unless Longoria had been convicted of the crime.**

Jurors 8, 9, 12, 13, 31, 24, 26, and 49 were also disqualified as a matter of law because they required there to be a criminal conviction to award damages in a civil case involving theft.

MR. SMITH: 26. Three things about yourself.

VENIREPERSON: I moved here from McCulloch County two years ago and I have a place out and a few cows and I just work and mind my own business. I don't really know anybody, don't -- I don't know that I could make an honest assumption, I guess, or something against somebody if I really knew that they did it. I can feel both sides.

MR. SMITH: Sure.

VENIREPERSON: But I don't know. If they didn't convict him, I guess on the criminal part, then --

MR. SMITH: Is that okay? Do you require a conviction on a criminal part to get a civil --

VENIREPERSON: It just looks like if he did it and you knew that he did it, that he would have been convicted.

MR. SMITH: Let me ask this, the last question I have. Would everyone or anyone require a criminal conviction in order to award money in a civil case for theft? Can I see the numbers of those people? Eight, 9, 12, 13, 31, 26 and 24 and 49.

THE COURT: Thank you, Mr. Smith.

MR. SMITH: Thank you all for sharing.

RR Vol. 4, 108.

## C. Challenges for cause were denied by the trial court.

The trial court denied the Shamark Parties' challenges for cause as to 6, 8, 9, 10, 12, 13, 14, 24, 26, 31, 32, 33, 47, 49, 50, and 51 based upon the jurors' responses requiring proof beyond a reasonable doubt, as opposed to proof by a preponderance of the evidence. CR 136–42. The trial court denied the Shamark Parties' challenges for cause as to jurors 8, 9, 12, 13, 24, 26, 31, and 49 based upon the jurors' responses requiring a criminal conviction before finding in favor of the Shamark Parties. CR 136–42. The trial court denied the Shamark Parties' request for more preemptory strikes. CR 142.

## D. Attempted rehabilitation by opposing counsel was ineffective.

Mr. Blanks attempted to rehabilitate the jurors who testified that they could not apply the preponderance of the evidence to the Shamark Parties' claim and defense that Longoria committed a theft of the items at the property. However, the rehabilitation was not specific to any juror and was not specific to the issue of applying the proper burden of proof to the issue of theft.

> MR. BLANKS: […] The question is -- here we go: Can you listen to the evidence without prejudging either side, understanding that both sides are saying the other side did something wrong? And can you use your life's experiences, your common sense? Can you use those things to sift through the evidence and simply make a decision about what is more likely than not to have happened? And that is really the standard, more likely than not. How can we resolve disputes between people in this county? That's the standard, by what is more likely than not. And if you can't reach that decision, if you can't do that, then you say there's not enough evidence one way or the other, I'm not going to do it.

13

Burden of proof is your common sense applied to the facts of this case and you say it's more likely than not Martin or these folks are telling the truth. When you head out of here, you're going to do that in every other venue and every other place in your life. Is there a reason you can't do it here? If you can't do it here, raise your card.

(No response.)

RR Vol. 4 127–28.

### E. Attempted rehabilitation by the Court was ineffective.

After the Court denied the challenges for cause, the trial court made a perfunctory attempt to rehabilitate the jurors on whether they could abide by the Court's instruction to apply the preponderance of the evidence standard. There was no attempt to discuss the matter individually with any juror and no direct questioning of any juror.

> THE COURT: All right. One last question for you before we take our final break, which is not a lunch break yet, is: You have heard discussion and questions concerning both civil and criminal cases, and as I advised you at the beginning of this case, this is a civil case, and I will advise you at the conclusion of the case and the lawyers would -- may argue between now and then about the preponderance of the evidence, which is the standard of proof in a civil case. You will also hear some testimony about a criminal matter in this case, which has a different burden of proof and you've also heard some questioning about that during the voir dire. Is there anyone here who has an understanding of either a civil or criminal law that will not allow them to follow the instructions that I as the Court give you concerning preponderance of the evidence, how that burden of proof is allocated between the parties and how it is shown? You are the judges of the facts and you will follow the law as I gave it to you. Is there anyone here who has -- who thinks they will be unable to follow the law as I will give it to you at the conclusion of this case?

> (No response.)

THE COURT: Absolutely anyone for any reason?

(No response.)

Thank you, ladies and gentlemen.  At this point, I see no hands and I am going to -- I am going to ask that you take a final 10-minute break, not for lunch, but you will be able to leave after that, both for a lunch break and for many of you permanently.  So do hold onto your numbers for now and please be back in your seats at exactly 2:00 o'clock.  Thank you.

RR Vol. 4, 145–46.

### F. The Shamark Parties had to use peremptory strikes against jurors who should have been struck for cause.  Also, three jurors who should have been struck for cause were selected for the jury.

The 12 member jury consisted of the following jurors from the panel:  1, 2, 4, 7, 8, 10, 11, 13, 16, 19, 21, 22, and alternate 25.  RR Vol. 4, 147; Supp. CR 20–28.[2]

Jurors 8, 10, and 13 on the jury panel had been challenged for cause because they would require proof beyond a reasonable doubt from the Shamark Parties, rather than proof by a preponderance of the evidence, on whether Longoria had stolen property.  Also, jurors 8 and 13 on the jury had been challenged for cause because

---

[2]  The Clerk's First Supplemental Record is sealed because it contains the jurors' personal information.  The jury cards appear at Supp. CR 20–28 and indicate in the upper right-hand corner the handwritten juror number with a circle around it.  The handwritten jury number is the number that was used during voir dire.  The printed number on the upper right-hand corner corresponds to the original jury numbers before the jury was shuffled as requested by Longoria's counsel.  RR Vol. 4, 32. The original printed numbers on the jury cards correspond to the randomly assigned numbers shown on the computer generated jury list.  Supp. CR 19.

they would require proof of a criminal conviction before they would find in favor of the Shamark Parties on whether Longoria had stolen property.

The Shamark Parties used seven preemptory strikes (six strikes plus one more for the alternate). The Shamark Parties used their preemptory strikes on the following jurors: 6, 9, 12, 14, 20, 24, and 26 (alternate). Supp. CR 38. Of the jurors struck by the Shamark Parties, the following had been challenged for cause for their inability to apply the preponderance of the evidence standard of proof: 6, 9, 12, 14, 24, and 26. Of the jurors struck by the Shamark Parties, the following had been challenged for cause for their inability to find in favor of the Shamark Parties on whether Longoria had stolen property without proof of a criminal conviction: 9, 12, 24, and 26. In other words, the Shamark Parties had to use five out of six of their preemptory strikes to strike jurors who should have been disqualified from jury service in this case. Supp. CR 38. Even after exercising their preemptory strikes, three jurors remained on the jury who had been challenged for cause—jurors 8, 10 and 13. Supp. CR 20–28. There was no chance of the Shamark Parties succeeding in this lawsuit with the jury stacked against them.

## SUMMARY OF THE ARGUMENT

There is no evidence of damages to support the judgment against the Shamark Parties. Due to the legal insufficiency of the evidence in support of Longoria's

16

claims for injury to reputation and mental anguish, the Shamark Parties request this Court to render judgment that Longoria take nothing on his claims.

This was a highly contentious case. The Shamark Parties insisted that Longoria committed theft and therefore Shamark's attempt to have him criminally prosecuted for that theft was justified. Longoria insisted he did not commit a theft and had permission to be on the property and removing items. The assertion of theft was a central issue on this case in both the pursuit of claims against Longoria to recover damages and in the defense of Longoria's counterclaims for malicious prosecution, intentional infliction of emotional distress, and defamation. The jury required the Shamark Parties to prove theft, whether as an affirmative claim or as a defense, beyond a reasonable doubt instead of by a preponderance of the evidence. The jury further required the Shamark Parties to prove that Longoria had been convicted of that crime before they would find in favor of the Shamark Parties in this civil case. The jury was stacked against the Shamark Parties. If this case is not rendered in favor of the Shamark Parties so that Longoria takes nothing on his claims because of lack of evidence of damages, then the entire case should be reversed for a new trial for factually insufficient evidence on damages and because the jury was improperly empaneled.

# ARGUMENT

## I. THE EVIDENCE IS LEGALLY AND FACTUALLY INSUFFICIENT TO SUPPORT ACTUAL DAMAGES.

Injury to reputation and mental anguish were the only damages requested by Longoria in this case. CR 1052–53. Longoria failed to offer any evidence at trial that his reputation was damaged or that he experienced a substantial disruption in his daily routine or a high degree of mental pain and distress due to the alleged published statement. *See Hancock v. Variyam*, 400 S.W.3d 59, 68 (Tex. 2013).

### A. Standard of review.

On an issue where the opposing party bears the burden of proof, a legal sufficiency challenge to an adverse finding is sustained if the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla. *Burbage v. Burbage*, 447 S.W.3 249, 259 (Tex. 2014) (attached as App. 3) (addressing evidence necessary to prove compensable injury to reputation). More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Id.* Evidence that creates a mere surmise or suspicion of a vital fact as, in legal effect, constitutes no evidence. *Id.* The evidence is considered in the light most favorable to the judgment, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.*

18

In reviewing a factual sufficiency challenge, this Court considers and weighs all of the evidence supporting and contradicting the challenged finding and sets aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *see Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989).

**B. Defamation was the gravamen of the complaint and the only basis for the jury's damages finding. Claims for intentional infliction of emotional distress and malicious prosecution were waived and do not support damages.**

The jury question on damages was directly linked only to the publication of alleged statement, "Martin Longoria had stolen components of or contents inside the Old Sneed Home." CR 1052–53 (Question 19 "What sum of money, if paid now in cash, would fairly and reasonably compensate Martin Longoria for his injuries, if any, that were proximately caused by the statement in Question 14?") Thus, damages were requested only for the alleged publication of the statement found in Question 14, not for the jury's findings of intentional infliction of emotional distress or for malicious prosecution which were submitted in Questions 12 and 13. CR 1052. Longoria waived his right to recover damages under any theory except defamation. *See* TEX. R. CIV. P. 278 (failure to submit a jury question in substantially correct form waives the complaint).

Further, where the gravamen of a complaint is really another tort (such as defamation), intentional infliction of emotional distress is not an available cause of

19

action.  *Hoffman-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004).

The intentional infliction of emotional distress was, first and foremost, a "gap-filler" tort, judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress. *Standard Fruit and Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998).

Nonetheless, under any theory of recovery, there is no evidence of injury to reputation or mental anguish.

**C. If more than nominal damages are awarded, then injury to reputation and mental anguish damages must be supported by evidence of actual injury.**

Texas law presumes that defamatory per se statements cause reputational harm and entitle a plaintiff to general damages such as loss of reputation and mental anguish. *Burbage*, 447 S.W.3d at 256 (citing *Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2002) (plurality opinion)).  But this presumption yields only nominal damages. *Id.* (citing *Salinas v. Salinas*, 365 S.W.3d 318, 320 (Tex. 2012) (per curiam)).  Beyond nominal damages, the appellate court reviews presumed damages for evidentiary support.  *Id.* (citing *Hancock*, 400 S.W.3d at 66.)

**D. Damages awarded for injury to reputation are not supported by the evidence.**

The Texas Supreme Court recently clarified the quality of evidence required to demonstrate a compensable injury to reputation.  *Burbage*, 447 S.W.3d at 259–

20

63. In *Burbage*, the Court determined that the plaintiff's ballpark estimate of the Burbage Funeral Home's value does not equate to evidence of actual damages for injury to the business's reputation. The record contained only speculative evidence that the value, if established, "would likely be lost." *Id*. at 261. Questioned whether the defamation could destroy the funeral home's reputation, the plaintiff said: "[P]otentially. In my opinion." *Id*. The plaintiff said the value would be "zero" only when questioned on what would happen if the funeral home was "run out of business." *Id*. The plaintiff's brother, testified that, in a small community, such allegations "can ruin that entire business." The Court noted at a theoretical possibility, however, is a far cry from a likely event. *Id*.

The *Burbage* opinion referred to the example case of *Waste Management of Texas, Inc. v. Texas Disposal Systems Landfill, Ltd*., 434 S.W.3d 142 (Tex. 2014). In that case, the key evidence of injury to Texas Disposal Systems' reputation was its CEO's testimony estimating the value of its reputation at $10 million, and three exhibits purportedly supported that testimony. *Burbage*, 447 S.W.3d at 260 (citing *Waste Management*, 434 S.W.3d at 160.) The exhibits estimated lost profits and evidenced a decrease in "base business." *Id*. First, the Court held that damages such as lost profits "are not the sort of general damages that necessarily flow from such a defamatory publication." *Id*. Then, the Court stated that the "evidence must support

21

the amount awarded by the jury; it must not be an 'indicator' that supports the estimates offered by the corporate executive." *Id.*

The *Burbage* opinion also referred to the example case of *Hancock v. Variyam*, wherein a doctor claimed that the submission of a defamatory letter to an accrediting body, which later denied the doctor accreditation, provided evidence of reputation damages. *Id.* at 262 (citing *Hancock*, 400 S.W.3d at 70). The Texas Supreme Court in *Hancock* held that "a jury may not reasonably infer an ultimate fact from 'meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.'" *Id.* at 70-71 (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)). Similarly, in *Burbage*, the Court determined that the jury cannot reasonably infer that defamation caused the cancellations of business when the cancellations could have occurred for any number of reasons. Indeed, the plaintiff in *Burbage* admitted that he did not ask why the customers cancelled, only that he was "afraid" it was because of accusations. *Id.* Suggestions of community awareness and other vague testimony about the impact of the alleged defamatory statement does not support the award of compensatory damages. *Id.*

Here, counsel for Longoria made it clear during trial that, "We are not asking for, nor are we seeking in the jury charge to recover any economic damages." RR Vol. 8, 203. Longoria testified that he cannot identify one person who told him that

22

they would not hire him for reasons relating to the theft accusation or arrest. RR Vol. 8, 202. No one has ever told him that they would not hire him because of the arrest. No one has ever told him that his reputation was damaged in any way. RR Vol. 8, 213–14. Here, the evidence on damages for injury to reputation does not withstand the scrutiny of the *Burbage* analysis. There is simply no evidence of compensable injury to reputation and no evidence to support the amount of $275,000 in injury to reputation damages in the past and $40,000 of injury to reputation damages in the future.

**E. Damages awarded for mental anguish are not supported by the evidence.**

Mental anguish damages cannot not be awarded without either "direct evidence of the nature, duration, or severity of [plaintiff's] anguish, thus establishing a substantial disruption in the plaintiff's daily routine", or other evidence of "'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger'". *Saenz v. Fidelity & Guar. Ins.*, 925 S.W.2d 607, 614 (Tex. 1996) (citing *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)).

Not only must there be evidence of the existence of compensable mental anguish, there must also be some evidence to justify the amount awarded. *Id.* While the impossibility of any exact evaluation of mental anguish requires that juries be given a measure of discretion in finding damages, that discretion is limited. Juries cannot simply pick a number and put it in the blank. *Id.* They must find an amount

23

that, in the standard language of the jury charge, "would fairly and reasonably compensate" for the loss. Compensation can only be for mental anguish that causes "substantial disruption in... daily routine" or "a high degree of mental pain and distress". *Id*. (*citing Parkway*, 901 S.W.2d at 444). There must be evidence that the amount found is fair and reasonable compensation, just as there must be evidence to support any other jury finding. *Id*. Reasonable compensation is no easier to determine than reasonable behavior—often it may be harder—but the law requires factfinders to determine both. And the law requires appellate courts to conduct a meaningful evidentiary review of those determinations. *Id*.

In this case, there is no evidence of the existence of compensable mental anguish and there is no evidence to justify the amount awarded. In *Saenz*, the plaintiff testified that she worried a lot, that her husband was already working two jobs, and she was worried that they were going to lose their house, and she knew she could not afford the medical bills that were coming in. *Id*. at 614. That testimony was not sufficient to support the existence of compensable mental anguish or that $250,000 would be fair and reasonable compensation. *Id*. Similarly here, Longoria testified of emotional distress from the financial concerns, but there was no evidence of financial hardship, and there was evidence that Longoria had substantial real property interests in Mexico. RR Vol. 8, 215. The level of emotional distress did not cause him any illness or physical symptoms. RR Vol. 8, 215. He testified that

24

he is in a bad mood sometimes, but he can still get up and do his daily activities and it did not disrupt those daily activities. RR Vol. 8, 216. There is simply no evidence of compensable mental anguish and no evidence to support the amount of $75,000 in mental anguish damages.

## II. NO ATTORNEY'S FEES AND NO EXEMPLARY DAMAGES MAY BE AWARDED.

The general rule in Texas is that each party is responsible for his or her own attorney's fees. *Turner v. Turner*, 385 S.W.2d 230, 233 (Tex. 1964). Texas follows the "American Rule" that "litigants' attorney's fees are recoverable only if authorized by statute or by a contract between the parties." *Intercont'l Grp. P'ship v. KB Home Lone Star, L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). Even for causes of action for which attorney's fees are potentially recoverable, there can be no award of attorney's fees without the award of actual damages. *See Mancorp, Inc. v. Culpepper*, 802 S.W.2d 227, 230 (Tex. 1990); *Holland v. Wal-Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999). Regardless of the cause of action forming the basis for attorney's fees, "the bottom line is the same: As there was no award to the client, there can be no attorney's fee award either." *Intercont'l Grp. P'ship*, 295 S.W.3d at 662. A suit for intentional infliction of emotional distress does not support an award of attorney's fees. *See Hoffmann-La Roche Inc.*, 144 S.W.3d at 446.

Statutory provisions for the recovery of attorney fees are penal in nature, and must be strictly construed. *Id.* Longoria did not request the jury to answer Question

8 on theft with an affirmative or negative finding. CR 1041. Question 8 was left unanswered by the jury and the issue was waived by Longoria. *Id.*; TEX. R. CIV. P. 278. Thus, Longoria cannot rely upon the statutory provision involving theft as a basis for the award of attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE § 134.005. The tort causes of action for intentional infliction of emotional distress, defamation, and malicious prosecution do not support the award of attorney's fees as a matter of law. Further, even if attorney's fees were somehow recoverable without actual damages, Longoria's counsel presented no evidence regarding attorneys' fees other than by stating that he had a one-third contingent fee agreement and he did not apportion the fees between the causes of action on which attorney's fees are recoverable or delineate what factors were considered to establish reasonableness. RR Vol. 8, 277. In this case, Longoria's counsel did not indicate how many hours were spent in the aggregate or were devoted to any particular task or category of tasks. Longoria presented no time records or other documentary evidence. Nor did Longoria's counsel testify based on their recollection of such records. The court could not discern from the evidence how many hours each of the tasks required and whether that time was reasonable. Without at least some indication of the time spent on various parts of the case, a court has little basis upon which to conduct a meaningful review of the fee award. Longoria's counsel simply suggested that the jury should add one-third additional to whatever they award Longoria. *Id.* Further,

26

Longoria's counsel made no attempt to justify appellate attorney's fees. The jury's award of attorney's fees does not correspond to Longoria's counsel's testimony and is not recoverable in this case.

Moreover, the judgment does not award appellate attorney's fees based upon an unsuccessful appeal. Instead, the judgment includes appellate attorney's fees automatically and then gives a "credit" of $50,000 if the judgment is not appealed, to the court of appeals and another "credit" of $20,000 if the judgment is not appealed to the Supreme Court. CR 1084. This unconditional award of appellate attorney's fees is improper. *Siegler v. Williams*, 658 S.W.2d 236, 241 (Tex. App.—Houston [1st Dist.] 1983, no writ). There must be evidence of the reasonableness of fees for appellate work to support the award of appellate attorney's fees, and the trial court must condition the award of attorney's fees to an appellee upon the appellant's unsuccessful appeal. *Id*.

A party may not recover exemplary damages unless the party establishes actual damages. *Burbage*, 447 S.W.3d at 263 (citing *Hancock*, 400 S.W.3d at 71). An award of nominal damages is not sufficient to support exemplary damages. TEX. CIV. PRAC. & REM. CODE § 41.004(a). Because no evidence supports the jury's award of actual damages, exemplary damages are not available.

## III. NO REMAND FOR A DETERMINATION OF NOMINAL DAMAGES.

When the defamation case is reversed based upon no evidence of actual damages, the court of appeals shall render judgment in favor of the defamation defendant rather than remand for a determination of nominal damages. *Burbage*, 447 S.W.3d at 263 (citing *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009) (recognizing that "where the record shows as a matter of law that the plaintiff is entitled only to nominal damages, the appellate court will not reverse merely to enable him to recover such damages" and instead rendering a take-nothing judgment)).

## IV. THE TRIAL COURT ABUSED ITS DISCRETION BY REFUSING TO STRIKE JURORS CHALLENGED FOR CAUSE.

The Shamark Parties' counsel moved to strike jurors 6, 8, 9, 10, 12, 13, 14, 24, 26, 31, 32, 33, 27, 49, 50, and 51 for cause based upon the jurors' statements that they could not apply the preponderance of the evidence to this case and would instead require the Shamark Parties to prove that Longoria committed theft beyond a reasonable doubt. RR Vol. 4, 136. The Shamark Parties' counsel also moved to strike jurors 8, 9, 12, 13, 24, 26, 31, 49 for cause based upon the jurors' statements that they would require a criminal conviction against Longoria before finding in favor of the Shamark Parties on the issue of theft in this case. RR Vol. 4, 136. The trial court denied the challenges for cause on both basis. RR Vol. 4, 141. The trial

court further denied the Shamark Parties' request for additional strikes against the jurors. RR Vol. 4, 142.

A person is disqualified to serve as a juror on a particular case if he or she has a bias or prejudice in favor of or against one of the parties, TEX. GOV'T CODE § 62.105(4), or demonstrates "a general inability to follow the court's instructions regarding the law." *Hyundai Motor Co. v. Vasquez*, 189 S.W.3d 743, 751 (Tex. 2006); *see* TEX. R. CIV. P. 226a. If a prospective juror's bias, prejudice, or inability to follow the trial court's instructions is established as a matter of law, the trial court must disqualify that person from service. *Malone v. Foster*, 977 S.W.2d 562, 564 (Tex. 1998).

To disqualify a potential juror for bias or prejudice as a matter of law, the record must conclusively show that the potential juror's state of mind led to the natural inference that he could not act with impartiality. *See Hyundai Motor Co.*, 189 S.W.3d at 751. Thus, a prospective juror who unequivocally admits bias or prejudice is disqualified to serve as a juror as a matter of law. *Shepherd v. Ledford*, 962 S.W.2d 28, 34 (Tex. 1998); *Sullemon v. U.S. Fid. & Guar. Co.*, 734 S.W.2d 10, 14 (Tex. App.—Dallas 1987, no writ).

When a prospective juror's disqualification is not established as a matter of law, the trial court must make a factual determination as to whether the prospective juror is nevertheless sufficiently biased or prejudiced to merit disqualification. *See*

29

*Sullemon*, 734 S.W.2d at 15 (citing *Swap Shop v. Fortune*, 365 S.W.2d 151, 154 (Tex. 1963)). A trial court's decision overruling a challenge for cause carries with it an implied finding that bias or prejudice does not exist to the degree necessary to warrant disqualification. *Buls v. Fuselier*, 55 S.W.3d 204, 209-10 (Tex. App.-Texarkana 2001, no pet.).

"The key response that supports a successful challenge for cause is that the veniremember cannot be fair and impartial because the veniremenber's feelings are so strong in favor of or against a party or against the subject matter of the litigation that the veniremember's verdict will be based on those feelings and not on the evidence." *Buls*, 55 S.W.3d at 210. The voir dire record is reviewed in relation to the veniremembers in light of this standard, mindful of the fact that a veniremember that is unequivocally biased or prejudiced "cannot revive his eligibility by recanting an earlier expression of bias or prejudice." *Smith v. Dean*, 232 S.W.3d 181, 190 (Tex. App.—Fort Worth 2007, pet. denied).

A trial court's ruling on a challenge for cause is reviewed for abuse of discretion. *Hyundai Motor Co.*, 189 S.W.3d at 753–54. A trial court abuses its discretion in refusing to disqualify a prospective juror for cause only if the record, viewed in the light most favorable to the trial court's ruling, shows that the venire member was not able or willing to set aside personal beliefs to act impartially. *Buls*, 55 S.W.3d at 210.

30

In this case, there is no question that the jury was stacked against the Shamark Parties. After substantial discussion with the jury on the differences between burdens of proof for a "preponderance of the evidence" and "beyond a reasonable doubt," and then after more discussion with the trial court outside the presence of the jury, counsel for the Shamark Parties followed up in his line of questioning by explaining the definition of the term "preponderance of the evidence." After having clarifying the definition of "preponderance of the evidence" to satisfy the trial court's concern, the jurors thereafter confirmed that they would hold the Shamark Parties to a higher burden of proof regardless of the trial court's instruction on the preponderance of the evidence. RR Vol. 4, 103. Sixteen potential jurors confirmed their conviction that they would hold the Shamark Parties to a higher burden than instructed by the court. *Id.* Three of those potential jurors became members of the jury. Supp. CR 20–28. Thereafter, counsel for the Shamark Parties asked the clear and critical question, "Would everyone or anyone require a criminal conviction in order to award money in a civil case for theft?" RR Vol. 4, 108. Nine potential jurors raised their hands in response to that question. *Id.* Two of those potential jurors became members of this jury. Supp. CR 20–28.

This is not a case in which there was any confusion demonstrated by the potential jurors. There was no individual voir dire of any juror to undermine their purported understanding of the issues. In this case, rehabilitation was not

31

permissible to clarify whether a potential juror's response results from confusion or misunderstanding. Unlike the case in *Murff*, there were no statements by the potential jurors that demonstrated that any of them had any confusion about the questions being asked of them. *See Murff v. Pass*, 249 S.W.3d 407, 409 (Tex. 2008). In *Murff*, although the potential juror indicated that he would hold Pass to a clear and convincing standard of proof, it is apparent that the potential juror was confused as to the definition of "preponderance of the evidence." *Id*. at 411. No such confusion was demonstrated by the potential jurors in this case and the definition of "preponderance of the evidence" was provided so that the jurors could confirm their answers from the earlier discussions of the standard of proof. RR Vol. 4, 103. Further, the additional issue of requiring the Shamark Parties to prove a criminal conviction against Longoria before they could find in favor of the Shamark Parties in this case was not an issue in the *Murff* case or cases cited by *Murff*.

The jury was stacked against the Shamark Parties. If this case is not rendered in favor of the Shamark Parties so that Longoria takes nothing on his claims because of lack of evidence of damages, then the entire case should be reversed for a new trial for factually insufficient evidence on damages and because the jury was improperly empaneled.

## V. CONCLUSION AND PRAYER.

Shamark Smith Limited Partnership, Paul J. Smith, and Sharon D. Marcus, Appellants, request this Court to render judgment in favor of Appellants in whole or in part, or remand this case for a new trial.

/s/ Tracy J. Willi
Tracy J. Willi
Texas Bar No. 00784633
Willi Law Firm, P.C.
9600 Escarpment Blvd., Suite 745, PMB 34
Austin, TX 78749-1983
Tel. (512) 288-3200
Fax (512) 288-3202
twilli@willi.com

ATTORNEY FOR SHAMARK SMITH
LIMITED PARTNERSHIP, SHARON D.
MARCUS, AND PAUL J. SMITH

## CERTIFICATE OF COMPLIANCE

In accordance with Texas Rule of Appellate Procedure 9.4, I hereby certify that this document contains 8457 words.

/s/ Tracy J. Willi
Tracy J. Willi

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that this document was filed with Clerk of Court through the Court's electronic filing system and served on opposing counsel by the same manner on April 6, 2015 as follows:

James David Walker
P.O. Box 41
Milano, Texas 76556
(512) 636-9520
(512) 455-7992 (fax)
walker@2appeal.com

Counsel for Martin Longoria

/s/ Tracy J. Willi
Tracy J. Willi

# Appendix 1

**CAUSE NO. 32,515**

| | |
|---|---|
| SHAMARK SMITH LIMITED, Partnership<br>Plaintiff | IN THE 20TH JUDICIAL |
| VS. | DISTRICT COURT OF |
| MARTIN M. LONGORIA<br>Defendant | MILAM COUNTY, TEXAS |

## FINAL JUDGMENT

On July 28, 2014, came on to be heard the trial of this cause. A jury was duly empaneled and evidence heard. At the conclusion of the evidence, the Court submitted the case to the jury. The Charge of the Court, including the jury's answers to the questions propounded therein, are incorporated into this Final Judgment for all purposes.

After the jury returned its unanimous verdict, Defendant/Counter Plaintiff, Martin M. Longoria, moved for judgment.

The jury unanimously found that neither Martin M. Longoria, nor any of his agents or employees, committed a conversion of any property, materials or items owned by Shamark Smith Limited Partnership, Sharon D. Marcus or Paul J. Smith.

The jury unanimously found that neither Martin M. Longoria , nor any of his agents or employees, trespassed on the real property owned by Shamark Smith Limited Partnership, Sharon D. Marcus or Paul J. Smith.

The jury unanimously found that Paul J. Smith, Sharon D. Marcus and Shamark Smith Limited Partnership maliciously prosecuted Martin M. Longoria.

FINAL JUDGMENT

PAGE 1

08.05.2014

1082

The jury unanimously found that Paul J. Smith, Sharon D. Marcus and Shamark Smith Limited Partnership intentionally inflicted severe emotional distress on Martin M. Longoria.

The jury unanimously found that Paul J. Smith, Sharon D. Marcus and Shamark Smith Limited Partnership published factual statements about Martin M. Longoria which were defamatory (as defined in the Charge of the Court), that such statements were false, that Paul J. Smith, Sharon D. Marcus and Shamark Smith Limited Partnership should have known, in the exercise of ordinary care, that the statements were false and had the potential to be defamatory, and that they knew such statements were false or that they were made with a high degree of awareness that they were probably false, to an extent that they in fact had serious doubts as to the truth of the statements.

The jury also unanimously found, by clear and convincing evidence, that Paul J. Smith, Sharon D. Marcus and Shamark Smith Limited Partnership acted with "malice," which was defined in the Charge of the Court as a specific intent by Paul J. Smith, Sharon D. Marcus and Shamark Smith Limited Partnership, to cause substantial injury or harm to Martin M. Longoria and that such action resulted in harm to him.

The unanimous verdict of the jury totals $703,000, upon which the Court will render judgment as set forth below.

The Court, having considered the jury's unanimous verdict, finds that judgment should be rendered against Paul J. Smith, Sharon D. Marcus and Shamark Smith Limited Partnership, and in favor of Martin M. Longoria as follows:

It is Ordered that Martin M. Longoria have judgment and recover from Paul J. Smith the amount of $120,000, in connection with actual damages found by the jury for which let

execution issue.

It is Ordered that Martin M. Longoria have judgment and recover from Sharon D. Marcus the amount of $120,000 in connection with actual damages found by the jury for which let execution issue.

It is Ordered that Martin M. Longoria have judgment and recover from Shamark Smith Limited Partnership the amount of $150,000 in connection with actual damages found by the jury for which let execution issue.

It is Further Ordered that Martin M. Longoria have judgment and recover from Paul J. Smith the additional amount of $30,000.00, referable to exemplary damages, for which let execution issue.

It is Further Ordered that Martin M. Longoria have judgment and recover from Sharon D. Marcus $30,000.00, referable to exemplary damages, for which let execution issue.

It is Further Ordered that Martin M. Longoria have judgment and recover from Shamark Smith Limited Partnership $40,000.00, referable to exemplary damages, for which let execution issue.

It is Further Ordered that Martin Longoria and his attorneys, Mickey Blanks and Bill Torrey, have and recover from Paul J. Smith, Sharon D. Marcus and Shamark Smith Limited Partnership, jointly and severally, attorney's fees in the sum of $213,000 for services rendered in this case, and it is the further judgment of the court that if this cause is not appealed, the judgment shall be credited with $50,000 as attorney's fees; but if this judgment is appealed to the Court of Appeals but not to the Supreme Court of Texas that this judgment shall be credited with $20,000 as attorney's fees.

It is Further Ordered that all amounts of the judgment here rendered will bear interest at the rate of five percent (5%) from date of judgment until paid.

All costs of Court spent or incurred in this cause are adjudged against Paul J. Smith, Sharon D. Marcus and Shamark Smith Limited Partnership, jointly and severally.

All writs and processes for the enforcement and collection of this judgment and costs of Court may issue as necessary.

All relief requested in this case and not expressly granted is denied. This judgment finally disposes of all parties and claims and is appealable.

SIGNED ON THIS THE __15th__ DAY OF __August__, 2014

_____
JUDGE PRESIDING

**FILED**

At _8:00_ o'clock _A_ M

AUG 1 8 2014

_Cindy Fechner_
CINDY FECHNER
DISTRICT CLERK, MILAM COUNTY, TEXAS

# Appendix 2

## CAUSE NO. 32,515

| | | |
|---|---|---|
| SHAMARK SMITH LIMITED PARTNERSHIP, Plaintiff | ‖ | IN THE DISTRICT COURT |
| VS. | ‖ | 20th JUDICIAL DISTRICT |
| MARTIN M. LONGORIA, Defendant. | ‖ | MILAM COUNTY, TEXAS |

### CHARGE OF THE COURT

**LADIES AND GENTLEMEN OF THE JURY:**

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason. I will give you a number where others may contact you in case of an emergency.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.

1. Do not let bias, prejudice, or sympathy play any part in your decision.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

FILED

At _2:25_ o'clock _P_ M

AUG 0 1 2014

CINDY FECHNER
DISTRICT CLERK, MILAM COUNTY, TEXAS

1031

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on the preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence unless you are told otherwise.

   The term "preponderance of the evidence" means the greater weight of credible evidence admitted in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7. Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Some questions may ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11. Unless otherwise instructed, the answers to the questions must be based on the decision of at least ten of the twelve jurors. The same ten jurors must agree on every answer. Do not agree to be bound by a vote of anything less than ten jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. That would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

1032

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

1033

**Question 1**

Did Martin M. Longoria or any of his agents or employees commit a conversion of any property, materials, or items owned by Shamark Smith Limited Partnership, Sharon D. Marcus, or Paul J. Smith?

You are instructed that "**conversion**" occurs if (1) Shamark Smith Limited Partnership, Sharon D. Marcus, or Paul J. Smith beneficially owned any property, materials, or items; and (2) Martin M. Longoria or any of his agents or employees wrongfully exercised dominion or control over the property, materials, or items to the injury of Shamark Smith Limited Partnership, Sharon D. Marcus, or Paul J. Smith.

Answer "Yes" or "No":

Answer: No

1034

If you answered "Yes" to Question 1, then answer the following question. Otherwise, do not answer the following question.

**Question 2**

What sum of money, if paid now in cash, would fairly and reasonably compensate Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith for the damages, if any, that were proximately caused by the conversion(s)?

Consider the elements of damages listed below and none other. Consider each element separately. Do not reduce the amount, if any, in your answers because of the wrongdoing, if any, of Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

1. Loss of market value.

Find the market value of the property, materials, or items in question in Milam County, Texas as of the date of the conversion(s), if any.

"Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

Answer in dollars and cents for damages, if any.

Answer: _____

2. Cost of repairs or restoration of the Old Sneed Home to its former condition.

Consider the reasonable cost in Milam County, Texas, to restore the Old Sneed Home to the condition it was immediately before the occurrence in question.

Answer in dollars and cents for damages, if any.

Answer: _____

3. Loss of use.

"Loss of use" damages compensate Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith for their lost profits sustained in the past.

Answer in dollars and cents for damages, if any.

Answer: _____

1035

**Question 3**

Did Martin M. Longoria or any of his agents or employees trespass on the real property belonging to Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith?

> Trespass to real property is defined as an unauthorized entry upon the land of another. Every unauthorized entry is a trespass even if no damage is done. A trespass can be either by entry of a person on another's land or by causing or permitting a thing to cross the boundary of the premises.

Answer "Yes" or "No."

Answer: ___No___

1036

If you answered "Yes" to Question 3, then answer the following question. Otherwise, do not answer the following question.

**Question 4**

What sum of money, if paid now in cash, would fairly and reasonably compensate Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith for the damages, if any, that were proximately caused by the trespass?

Consider the elements of damages listed below and none other. Consider each element separately. Do not reduce the amount, if any, in your answers because of the wrongdoing, if any, of Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

1.      Loss of market value.

Find the market value of the property, materials, or items in question in Milam County, Texas as of the date of the conversion(s), if any.

"Market value" means the amount that would be paid in cash by a willing buyer who desires to buy, but is not required to buy, to a willing seller who desires to sell, but is under no necessity of selling.

Answer in dollars and cents for damages, if any.

Answer: _____

2.      Cost of repairs or restoration of the Old Sneed Home to its former condition.

Consider the reasonable cost in Milam County, Texas, to restore the Old Sneed Home to the condition it was immediately before the occurrence in question.

Answer in dollars and cents for damages, if any.

Answer: _____

3.      Loss of use.

"Loss of use" damages compensate Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith for their lost profits sustained in the past.

Answer in dollars and cents for damages, if any.

Answer: _____

1037

Answer the following question only if you unanimously answered "Yes" to Questions 1 or 3. Otherwise. do not answer the following question.

**Question 5**

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

Do you find by clear and convincing evidence that the harm to Shamark Smith Limited Partnership. Sharon D. Marcus, and/or Paul J. Smith resulted from malice?

> **"Clear and convincing evidence"** means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

> **"Malice"** means a specific intent by Martin M. Longoria or any of his agents or employees to cause substantial injury or harm to Shamark Smith Limited Partnership. Sharon D. Marcus, and/or Paul J. Smith.

> Answer "Yes" or "No."

> Answer: _____

1038

Answer the following question only if you unanimously answered "Yes" to Questions 1 or 3. Otherwise, do not answer the following question.

**Question 6**

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

Do you find by clear and convincing evidence that the harm to Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith resulted from gross negligence?

**"Clear and convincing evidence"** means the degree or measure of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

**"Gross negligence"** means an act or omission by Martin M. Longoria or any of his agents or employees,

    (a)    which when viewed objectively from the standpoint of Martin M. Longoria or any of his agents or employees at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of its potential harm to others; **and**

    (b)    of which Martin M. Longoria or any of his agents or employees has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Answer "Yes" or "No."

Answer: _____

1039

Answer the following question only if you unanimously answered "Yes" to Question 5 or 6. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

**Question 7**

What sum of money, if any, if paid now in cash, should be assessed against Martin M. Longoria and awarded to Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith as exemplary damages, if any, for the conduct found in response to Question 5 or 6?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

      a.      The nature of the wrong.

      b.      The character of the conduct involved.

      c.      The degree of culpability of Martin M. Longoria.

      d.      The situation and sensibilities of the parties concerned.

      e.      The extent to which such conduct offends a public sense of justice and propriety.

      f.      The net worth of Martin M. Longoria.

Answer in dollars and cents, if any.

Answer: _____

1040

## Question 8

Answer the following question only if you unanimously answered "Yes" to Question 1. Otherwise, do not answer the following question.

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

Did Martin M. Longoria or any of his agents or employees commit "Theft", and was the value of the stolen property $20,000.00 or greater?

"Theft" means that a person unlawfully appropriates *property* with the intent to deprive the owner of property. Appropriating *property* is unlawful if it is without the owner's effective consent.

A person acts with intent with respect to the nature of his conduct or to a result of his conduct when it is the conscious objective or desire to engage in the conduct or cause the result.

"Deprive" means to *withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner.*

"Owner" means a person who has title to the property, possession of the property, whether lawful or not, or a greater right to possession of the property than *Martin M. Longoria or any of his agents or employees.*

"Property" means anything of value.

"Consent" means assent in fact, whether express or implied.

"Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if induced by deception or coercion.

Answer "Yes" or "No."

Answer: _____

1041

Answer the following question only if you answered "Yes" to Question 8. Otherwise, do not answer the following question.

**Question 9**

What is a reasonable fee for the necessary services of Shamark Smith Limited Partnership and Sharon D. Marcus' attorneys stated in dollars and cents?

Factors to consider in determining a reasonable fee include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

a. For representation in the trial court.

Answer: _____

b. For representation through appeal to the Court of Appeals.

Answer: _____

c. For representation through appeal to the Supreme Court of Texas.

Answer: _____

1042

Answer the following question only if you answered "Yes" to Question 8. Otherwise, do not answer the following question.

## Question 10

What is a reasonable fee for the necessary services of Paul J. Smith's attorney, stated in dollars and cents?

Factors to consider in determining a reasonable fee include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

a. For representation in the trial court.

Answer: _____

b. For representation through appeal to the Court of Appeals.

Answer: _____

c. For representation through appeal to the Supreme Court of Texas.

Answer: _____

1043

Answer the following question only if you answered "No" to Question 8. Otherwise, do not answer the following question.

**Question 11**

What is a reasonable fee for the necessary services of Martin M. Longoria's attorneys, stated in dollars and cents?

Factors to consider in determining a reasonable fee include:

(1)     the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2)     the likelihood that the acceptance of the particular employment will preclude other employment by the lawyer;

(3)     the fee customarily charged in the locality for similar legal services;

(4)     the amount involved and the results obtained;

(5)     the time limitations imposed by the client or by the circumstances;

(6)     the nature and length of the professional relationship with the client;

(7)     the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8)     whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

Answer with an amount for each of the following:

a.     For representation in the trial court.

Answer: $163,000.00

b.     For representation through appeal to the Court of Appeals.

Answer: $30,000.00

c.     For representation through appeal to the Supreme Court of Texas.

Answer: $20,000.00

1044

**Question 12**

Did Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership maliciously prosecute Martin Longoria?

"Malicious prosecution" occurs when one person initiates or procures, with malice, and without probable cause at the time the prosecution is commenced, the prosecution of an innocent person.

"Malice" means ill will, bad or evil motive, or such gross indifference to the rights of others as to amount to a willful or wanton act.

"Probable cause" means the existence of such facts and circumstances as would excite belief in a person of reasonable mind, acting on the facts or circumstances within his knowledge at the time the prosecution was commenced, that the other person was guilty of a criminal offense. The probable cause determination asks whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: ___Yes___

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: ___Yes___

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: ___Yes___

1045

**Question 13**

Did Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership intentionally inflict severe emotional distress on Martin Longoria?

Intentional infliction of emotional distress occurs when the defendant acts intentionally or recklessly with extreme and outrageous conduct to cause the ~~plaintiff~~ emotional distress and the emotional distress suffered by ~~the plaintiff~~ was severe.

"Extreme and outrageous conduct" occurs only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: __Yes__

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: __Yes__

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: __Yes__

1046

**Question 14**

Did Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership publish the following statement: that Martin Longoria had stolen components of or contents inside the Old Sneed Home?

"Publish" means intentionally or negligently to communicate the matter to a person other than Martin Longoria who is capable of understanding its meaning and may be made orally or in writing.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: ____Yes____

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: ____Yes____

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: ____Yes____

1047

If you answered "Yes" in Question 14 as to Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership, then answer the following question as to that respective party. Otherwise, do not answer the following question.

**Question 15**

Was the statement in Question 14 defamatory concerning Martin Longoria?

"Defamatory" means an ordinary person would interpret the statement in a way that tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach the person's honesty, integrity, virtue, or reputation.

In deciding whether a statement is defamatory, you must construe the statement as a whole and in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: __Yes__

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: __Yes__

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: __Yes__

1048

If you answered "Yes" in Question 15 as to Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership, then answer the following question as to that respective party. Otherwise, do not answer the following question.

**Question 16**

Do you find that the statement that Martin Longoria had stolen components of or contents inside the Old Sneed Home was false at the time it was made as it related to Martin Longoria?

"False" means that a statement is not literally true or not substantially true. A statement is not "substantially true" if, in the mind of the average person, the gist of the statement is more damaging to the person affected by it than a literally true statement would have been.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: _____Yes_____

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: _____Yes_____

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: _____Yes_____

1049

If you answered "Yes" in Question 16 as to Paul J. Smith. Sharon D. Marcus. and/or Shamark Smith Limited Partnership. then answer the following question as to that respective party. Otherwise. do not answer the following question.

**Question 17**
Did Paul J. Smith. Sharon D. Marcus. and/or Shamark Smith Limited Partnership know or should they have known. in the exercise of ordinary care. that the statement contained in Question 14 was false and had the potential to be defamatory?

> "Ordinary care" concerning the truth of the statement and its potential to be defamatory means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: _____Yes_____

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: _____Yes_____

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: _____Yes_____

1050

If you answered "Yes" in Question 17 as to Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership, then answer the following question as to that respective party. Otherwise, do not answer the following question.

**Question 18**

Do you find by clear and convincing evidence that, at the time Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership made the statement in Question 14:

1. Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership knew it was false as it related to Martin Longoria, or

2. Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership made the statement with a high degree of awareness that it was probably false, to an extent that Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership in fact had serious doubts as to the truth of the statement?

"Clear and convincing evidence" is that measure or degree of proof that will produce in the mind of the jury a firm belief or conviction as to the truth of the allegations sought to be established.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: _____Yes_____

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: _____Yes_____

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: _____Yes_____

1051

If you answered "Yes" in Question(s) 12, 13, or 18 as to Paul J. Smith, Sharon D. Marcus, and/or Shamark Smith Limited Partnership, then answer the following question as to that respective party. Otherwise, do not answer the following question.

**Question 19**

What sum of money, if paid now in cash, would fairly and reasonably compensate Martin Longoria for his injuries, if any, that were proximately caused by the statement in Question 14?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss.

That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately in dollars and cents for damages, if any.

a. Injury to reputation sustained in the past.

Answer as to Paul J. Smith:

Answer: $90,000.00

Answer as to Sharon D. Marcus:

Answer: $90,000.00

Answer as to Shamark Smith Limited Partnership:

Answer: $95,000.00

b. Injury to reputation that, in reasonable probability, Martin Longoria will sustain in the future.

Answer as to Paul J. Smith:

Answer: $10,000.00

Answer as to Sharon D. Marcus:

Answer: $10,000.00

Answer as to Shamark Smith Limited Partnership:

Answer: $20,000.00

1052

c. Mental anguish sustained in the past.

Answer as to Paul J. Smith:

Answer: _$20,000.00_

Answer as to Sharon D. Marcus:

Answer: _$20,000.00_

Answer as to Shamark Smith Limited Partnership:

Answer: _$35,000.00_

d. Mental anguish that, in reasonable probability, Martin Longoria will sustain in the future.

Answer as to Paul J. Smith:

Answer: _— O —_

Answer as to Sharon D. Marcus:

Answer: _— 0 —_

Answer as to Shamark Smith Limited Partnership:

Answer: _— 0 —_

1053

Answer the following question only if you unanimously answered "Yes" to Question(s) 12, 13, or 18. Otherwise, do not answer the following question.

**Question 20**

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

Do you find by clear and convincing evidence that the harm to Martin M. Longoria resulted from malice?

"**Clear and convincing evidence**" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"**Malice**" means a specific intent by Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith or any of his agents or employees to cause substantial injury or harm to Martin M. Longoria

Answer "Yes" or "No" as to Paul J. Smith.

Answer: ___Yes___

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: ___Yes___

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: ___Yes___

1054

Answer the following question only if you unanimously answered "Yes" to Question 20. Otherwise, do not answer the following question.

**Question 21**

To answer "Yes" to any part of the following question, your answer must be unanimous. You may answer "No" to any part of the following question only upon a vote of ten or more jurors. Otherwise, you must not answer that part of the following question.

Do you find by clear and convincing evidence that the harm to Martin M. Longoria resulted from fraud?

> **"Clear and convincing evidence"** means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

> **"Fraud"** occurs when:

> 1. A party makes a material misrepresentation, and

> 2. The misrepresentation is made with knowledge of its falsity or made recklessly without any knowledge of the truth and as a positive assertion; and

> 3. The misrepresentation is made with the intention that it should be acted on by the other party; and

> 4. The other party relies on the misrepresentation and thereby suffers injury.

> **"Misrepresentation"** means a false statement of fact.

Answer "Yes" or "No" as to Paul J. Smith.

Answer: _____Yes_____

Answer "Yes" or "No" as to Sharon D. Marcus

Answer: _____Yes_____

Answer "Yes" or "No" as to Shamark Smith Limited Partnership

Answer: _____Yes_____

Answer the following question only if you unanimously answered "Yes" to Question 21. Otherwise, do not answer the following question.

You must unanimously agree on the amount of any award of exemplary damages.

**Question 22**

What sum of money, if any, if paid now in cash, should be assessed against Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith and awarded to Martin M. Longoria as exemplary damages, if any, for the conduct found in response to Questions 20 or 21?

"Exemplary damages" means an amount that you may in your discretion award as a penalty or by way of punishment.

Factors to consider in awarding exemplary damages, if any, are—

      a.     The nature of the wrong.

      b.     The character of the conduct involved.

      c.     The degree of culpability of Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith.

      d.     The situation and sensibilities of the parties concerned.

      e.     The extent to which such conduct offends a public sense of justice and propriety.

      f.     The net worth of Shamark Smith Limited Partnership, Sharon D. Marcus, and/or Paul J. Smith.

Answer in dollars and cents, if any.

Answer as to Paul J. Smith:

Answer: $30,000.00

Answer as to Sharon D. Marcus:

Answer: $30,000.00

Answer as to Shamark Smith Limited Partnership:

Answer: $40,000.00

1056

When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

The presiding juror has these duties:

1. have the complete charge read aloud if it will be helpful to your deliberations;

2. preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

3. give written questions or comments to the bailiff who will then give them to the judge;

4. write down the answers that you agree on;

5. get the signatures for the verdict certificate; and

6. notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

Unless otherwise instructed, you may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

If 10 jurors agree on every answer, those 10 jurors sign the verdict.

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

There are some special instructions before Questions 5, 6, 7, 8 and 22 explaining how to answer those questions. Please follow the instructions. If all 12 of you answer those questions, you will need to complete a second verdict certificate for those questions.

Do you understand these instructions? If you do not, please tell me now.

JUDGE PRESIDING

**Verdict Certificate**

Check one:

✓ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

*Judy Shelander*       Judy Shelander

Signature of Presiding Juror       Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

SIGNATURE       NAME PRINTED

1. _____       _____

2. _____       _____

3. _____       _____

4. _____       _____

5. _____       _____

6. _____       _____

7. _____       _____

8. _____       _____

9. _____       _____

10. _____       _____

11. _____       _____

**FILED**
At 8:15 o'clock P M
AUG 0 1 2014

Cindy Fechner
CINDY FECHNER
DISTRICT CLERK, MILAM COUNTY, TEXAS

1058

If you have answered Questions 5, 6, 7, 8 and/or 22, then you must sign this certificate also.

**ADDITIONAL CERTIFICATE**

I certify that the jury was unanimous in answering Question No. 5. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

_____          _____
Signature of Presiding Juror                           Printed Name of Presiding Juror


I certify that the jury was unanimous in answering Question No. 6. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

_____          _____
Signature of Presiding Juror                           Printed Name of Presiding Juror


I certify that the jury was unanimous in answering Question No. 7. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

_____          _____
Signature of Presiding Juror                           Printed Name of Presiding Juror


I certify that the jury was unanimous in answering Question No. 8. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

_____          _____
Signature of Presiding Juror                           Printed Name of Presiding Juror


I certify that the jury was unanimous in answering Question No. 22. All twelve of us agreed to the answer. The presiding juror has signed the certificate for all twelve of us.

*Judy Shelander*                              *Judy Shelander*
_____          _____
Signature of Presiding Juror                           Printed Name of Presiding Juror

**FILED**
At _8:15_ o'clock _P_ M

AUG 0 1 2014

*Cindy Fechner*
CINDY FECHNER
DISTRICT CLERK, MILAM COUNTY, TEXAS

1059

# Appendix 3

Allen Chadwick BURBAGE, Petitioner
and Cross–Respondent,

v.

W. Kirk BURBAGE and Burbage
Funeral Home, Respondents
and Cross–Petitioners.

No. 12–0563.

Supreme Court of Texas.

Argued Jan. 9, 2014.

Delivered Aug. 29, 2014.

**Background:** Owner of family funeral home brought action against his brother for defamation. The 21st Judicial District Court, Bastrop County, Terry L. Flenniken, J., entered judgment in favor of owner on jury verdict of nearly $10 million in compensatory and exemplary damages, and the trial court permanently enjoined brother from publishing like statements. Brother appealed. The Austin Court of Appeals, Jeff Rose, J., 447 S.W.3d 291, affirmed in part, modified in part, and vacated in part. Both parties sought review.

**Holdings:** The Supreme Court, Green, J., held that:

(1) objection by brother failed to preserve for appeal issue of improper instruction, and

(2) no evidence supported jury's award of $3.8 million in actual damages to owner.

Affirmed in part and reversed in part.

**1. Libel and Slander** ⚖️**50**

The common law provides a qualified privilege against defamation liability when communication is made in good faith and the author, the recipient, or a third person, or one of their family members, has an interest that is sufficiently affected by the communication.

**2. Libel and Slander** ⚖️**93, 101(4)**

The qualified privilege against defamation liability when the communication is made in good faith and the author, recipient, or a third person, or one of their family members has an interest that is sufficiently affected by the communication operates as an affirmative defense in the nature of confession and avoidance; the defendant bears the burden of proving privileged publication unless the plaintiff's petition affirmatively demonstrates privilege.

**3. Libel and Slander** ⚖️**101(4)**

If a defendant establishes a qualified privilege against defamation liability when the communication is made in good faith and the author, recipient, or a third person, or one of their family members has an interest that is sufficiently affected by the communication, the burden shifts to the plaintiff to prove that the defendant made the statements with actual malice.

**4. Libel and Slander** ⚖️**4**

"Actual malice," in the defamation context, means the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true.

See publication Words and Phrases for other judicial constructions and definitions.

**5. Libel and Slander** ⚖️**123(8)**

Qualified privilege against defamation liability when the communication is made in good faith and the author, recipient, or a third person, or one of their family members has an interest that is sufficiently affected by the communication presents a question of law when the statements at issue employ unambiguous language and where the facts and circumstances of publication are undisputed.

**6. Libel and Slander ⚷124(7), 128**

Comingling of unprivileged and potentially privileged statements for the jury to determine if each was substantially true at the time it was made may result in harmful error in defamation action.

**7. Trial ⚷238**

It is fundamental to the system of justice that parties have the right to be judged by a jury properly instructed in the law.

**8. Appeal and Error ⚷213**

Where a party does not raise an objection in defamation action to comingling of unprivileged and potentially privileged statements for the jury to determine if each was substantially true at the time it was made, that party cannot raise the issue, as it failed to preserve the claim.

**9. Appeal and Error ⚷230, 231(1), 242(1)**

The test for whether an issue is preserved for appeal ultimately asks whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling. Rules App.Proc., Rule 33.1.

**10. Trial ⚷279**

Purpose of rule that requires the party objecting to a charge to point out distinctly the objectionable matter and the grounds of the objection is to afford trial courts an opportunity to correct errors in the charge by requiring objections both to clearly designate the error and to explain the grounds for complaint. Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

**11. Appeal and Error ⚷231(1)**

In order for an objection to preserve an issue for appeal, it must apprise the trial court of the error alleged such that the court has the opportunity to correct the problem. Vernon's Ann.Texas Rules Civ.Proc., Rule 274.

**12. Appeal and Error ⚷232(3)**

Objection by brother of family funeral home owner failed to preserve for appeal issue of improper instruction regarding statements made in a letter in action by owner against owner's brother for defamation, although the objection raised the subject of qualified privilege; where, when the trial court asked brother if he had a requested instruction, he responded only with a request for a question that appeared to address the falsity of the statements themselves, and it was unclear what brother hoped to accomplish by requesting an additional question. Vernon's Ann.Texas Rules Civ.Proc., Rule 274; Rules App. Proc., Rule 33.1.

**13. Appeal and Error ⚷231(1), 775**

Procedural rules are construed liberally so that the right to appeal is not lost unnecessarily; but, when an objection fails to explain the nature of the error, court cannot make assumptions.

**14. Appeal and Error ⚷181**

Preservation of error reflects important prudential considerations recognizing that the judicial process benefits greatly when trial courts have the opportunity to first consider and rule on error.

**15. Appeal and Error ⚷181**

Affording courts the opportunity to first consider and rule on an alleged error conserves judicial resources and promotes fairness by ensuring that a party does not neglect a complaint at trial and raise it for the first time on appeal.

**16. Attorney and Client ⚷62**

Supreme Court may not stray from procedural rules because a party represented himself at trial.

**17. Appeal and Error ⚷1001(1, 3)**

On an issue where the opposing party bears the burden of proof, Supreme Court

sustains a legal-sufficiency challenge to an adverse finding if its review of the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla.

**18. Appeal and Error ⚵1001(1)**

More than a scintilla of evidence exists, as required to defeat a legal sufficiency challenge to an adverse finding, when the evidence would enable reasonable and fair-minded people to reach different conclusions.

**19. Appeal and Error ⚵1001(3)**

Supreme Court regards evidence that creates a mere surmise or suspicion of a vital fact as, in legal effect, no evidence.

**20. Appeal and Error ⚵930(1)**

Supreme Court considers the evidence in the light most favorable to the judgment, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not.

**21. Libel and Slander ⚵101(1), 114**

Texas law presumes that defamatory per se statements cause reputational harm and entitle a plaintiff to general damages such as loss of reputation and mental anguish; but this presumption yields only nominal damages.

**22. Appeal and Error ⚵1004(1)**

Beyond nominal damages, Supreme Court reviews presumed damages for evidentiary support.

**23. Libel and Slander ⚵121(.5)**

Jury latitude in awarding damages in defamation action has limits; latitude does not give the jury carte blanche to do whatever it will, especially when the action is brought by public officials.

**24. Libel and Slander ⚵128**

Judicial review of jury discretion in awarding damages in defamation action remains important to protect free speech, even in a case outside the realm of media defendants and public officials.  U.S.C.A. Const.Amend. 1.

**25. Libel and Slander ⚵116**

Supreme Court must ensure that non-economic damages in defamation action compensate for actual injuries and are not simply a disguised disapproval of the defendant.

**26. Libel and Slander ⚵112(1)**

Some concrete basis for an estimate of the value of a business injured by defamation is required.

**27. Libel and Slander ⚵117**

No evidence supported jury's award of $3.8 million in actual damages to owner of funeral home from defamation by owner's brother, where the evidence did not show actual loss of reputation, that anyone believed the defamation, that the business suffered an actual loss, or even the funeral home's actual value.

**28. Damages ⚵87(2)**

A party may not recover exemplary damages unless the plaintiff establishes actual damages.

**29. Constitutional Law ⚵2174**
    **Injunction ⚵1456**

Prohibitive injunctions of future speech that is the same or similar to speech that has been adjudicated to be defamatory operate as impermissible prior restraints on free speech.  U.S.C.A. Const. Amend. 1.

———————

David    Greene,    Electronic    Frontier Foundation, San Francisco, CA, Marc A.

Fuller, Vinson & Elkins LLP, Dallas, TX, for Amicus Curiae, Electronic Frontier Foundation.

James J. Scheske, James J. Scheske, PLLC, Peter D. Kennedy, William Gerow Christian, Graves Dougherty Hearon & Moody PC, Austin, TX, Jason P. Steed, Bell Nunnally & Martin LLP, Dallas, TX, for Petitioner, Allen Chadwick Burbage.

Gregory Scott Cagle, Savrick, Schumann, Johnson, McGarr Kaminski & Shirley, LLP, Austin, TX, for Respondent, W. Kirk Burbage and Burbage Funeral Home.

Justice GREEN delivered the opinion of the Court.

In this defamation case, a jury assessed compensatory and exemplary damages against Allen Chadwick Burbage (Chad) for ten statements defaming his brother, W. Kirk Burbage (Kirk). The trial court also permanently enjoined Chad from making similar statements. We are presented with three issues: (1) whether any defamatory statements fell within a qualified privilege; (2) whether evidence supports the jury's damage awards; and (3) whether the trial court abused its discretion by issuing the permanent injunction. Because we hold that Chad failed to preserve error in the charge, we do not reach the issue of qualified privilege. We also hold that the permanent injunction operates as an impermissible prior restraint on freedom of speech. Accordingly, we affirm those parts of the court of appeals' judgment. But, on damages, we hold that no evidence supports the compensatory damage award. We reverse that part of the court of appeals' judgment.

## I. Factual and Procedural Background

Kirk owns and operates the Burbage Funeral Home, a centuries-old family business, in Worcester County, Maryland. Chad is Kirk's older brother. Chad and Kirk's grandmother, Anna Burbage, managed the funeral home from her husband's death in the 1940s until her death in 1985. In her will, Anna left the funeral home and all of its assets to Kirk.

Anna bequeathed the land for the Burbage family cemetery to her children, Richard Burbage, Sr., Chad and Kirk's father, and Jean Burbage Prettyman. Although primarily a family cemetery, Anna and Richard gave permission for burial or entombment of several non-family members. Richard died in 1991; in his will, he left his 50% undivided interest in the family cemetery property to Chad and Kirk's mother, Virginia Burbage Markham, but the will was never probated. Virginia conveyed this interest to Kirk by quitclaim deed in 2003. Chad felt Kirk obtained the funeral home and the family cemetery interest through manipulation, first of Anna and later of Virginia.

Although the origin of the strife between Chad and Kirk remains unclear, the "Farm Property," a 23–acre tract that Virginia inherited from Richard in 1991, aggravated any existing discord. The potential sale of the property ultimately aligned Virginia's four children against each other: Chad and Patrice Burbage Lehmann wanted to sell, while Kirk and his brother, Keith, demurred. Throughout 2006 and 2007, Chad exchanged heated emails with Kirk's attorney. In late 2007 and early 2008, Chad created a website, www.annaburbage.org, to air his grievances with Kirk. Chad placed several posters around town to publicize the website. The website contained the following allegations:

- "Anna Burbage ('Miss Anna') was a victim of Elder Abuse. The Abuser was her grandson, Kirk Burbage and others."

- "Virginia Burbage Markham was the principal of Stephen Decatur High School serving northern Worcester County Maryland. At the present time, she is being abused by her son, Kirk Burbage, of the Burbage Funeral Home. She is currently a victim of ELDER as well as FAMILY ABUSE."
- "The methods [of abuse] include: lies, trespassing, grand larceny, will tampering/undue influence, gifts with the intent to control his mother, discrediting fellow siblings, deceptively misrepresenting the contents of legal documents requiring the signature of the ABUSED for personal gain and to cover up land fraud and involving the ABUSED ELDER in Cemetery Land Fraud implicating several families including Shirley and Brice Phillips of the Phillips Crab House."
- "Kirk Burbage has also been known to abuse the dead, specifically his cousin, Anne Prettyman Jones."

Chad also sent letters to Shirley and Brice Phillips, family friends of the Burbages who had earlier obtained permission to place a mausoleum in the Burbage cemetery. The letters espoused a common interest in settling property rights to the cemetery but stated, "You currently have no title or right to be in the Burbage Family Cemetery." Chad made the following statements in the letters:

- "Kirk Burbage has committed numerous abuses to family members."
- "We are the victims of the selfish, greedy and unlawful actions of Kirk Burbage."
- "Kirk Burbage of the Burbage Funeral Home with the assistance of his attorney Robert McIntosh have fraud-

ulently misrepresented rights which Kirk Burbage does not have...."
- "Kirk Burbage fraudulently obtained a Quit Claim [deed] from our mother by what is believed to be elder abuse...."
- "Kirk Burbage and the Burbage Funeral Home violated Maryland law by not having a license to operate a cemetery"
- "Kirk Burbage did commit fraud."

Kirk and the Burbage Funeral Home sued Chad for defamation in Bastrop County.[1] Chad appeared pro se. The trial court submitted ten questions—one for each of the statements reproduced above—asking the jury whether Chad had proven that the statements were substantially true. The jury answered "no" to all questions. The court also asked questions on compensatory and exemplary damages for Kirk and, separately, for the Burbage Funeral Home. The court instructed the jury that all statements were defamatory per se because each statement either leveled a criminal charge or tended to cause injury to the funeral home's business or to Kirk's profession. The jury awarded Kirk $6,552,000: $250,000 for past injury to reputation; $2,500,000 for future injury to reputation; $1,000 for past mental anguish; $1,000 for future mental anguish; and $3,800,000 in exemplary damages. The jury awarded the Burbage Funeral Home $3,050,000: $50,000 for past injury to reputation; $1,000,000 for future injury to reputation; and $2,000,000 in exemplary damages. The trial court also permanently enjoined Chad from future defamatory speech in a four-page list of prohibited topics (tied to the ten defamatory statements).

---

**1.** Chad was a resident of Bastrop County, Texas at the time the lawsuit was filed. *See* Tex. Civ. Prac. & Rem.Code § 15.017.

Chad appealed. The court of appeals reduced the exemplary damages to $750,000 under Texas Civil Practice and Remedies Code section 41.008(b), upheld the other damage awards, and vacated the injunction. 447 S.W.3d 291, 295, 2011 WL 6756979 (Tex.App.-Austin 2011, pet. granted) (mem.op.). Each party petitioned for review; we granted both petitions. 57 Tex. Sup.Ct. J. 53 (Nov. 22, 2013).

## II. Qualified Privilege and Charge Error

We first address Chad's contention that qualified privilege barred Kirk's recovery based on Chad's defamatory statements to the Phillipses. If Chad's statements were privileged, the jury's answers on damages would rest upon invalidly submitted theories of liability. We hold that, even if the privilege applied, Chad failed to preserve jury charge error on this point.

### A. Chad's Qualified Privilege Claim

**[1–5]** The common law provides a qualified privilege against defamation liability when "communication is made in good faith and the author, the recipient or a third person, or one of their family members, has an interest that is sufficiently affected by the communication." *Cain v. Hearst Corp.,* 878 S.W.2d 577, 582 (Tex. 1994). We have recognized that defamation actions necessarily inhibit free speech and, thus, the qualified privilege offers an additional safeguard, even in cases of private, non-political speech. *See id.* The privilege operates as an affirmative defense in the nature of confession and avoidance; the defendant bears the burden of proving privileged publication unless the plaintiff's petition affirmatively demonstrates privilege. *Denton Pub. Co. v.*

*Boyd,* 460 S.W.2d 881, 884 (Tex.1970). If a defendant establishes the privilege, the burden shifts to the plaintiff to prove that the defendant made the statements with actual malice. *Dun & Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896, 898 (Tex.1970). Actual malice, in the defamation context, means "the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true." *Hagler v. Proctor & Gamble Mfg. Co.,* 884 S.W.2d 771, 772 (Tex.1994) (per curiam). Qualified privilege presents a question of law when the statements at issue employ unambiguous language and where the facts and circumstances of publication are undisputed. *Fitzjarrald v. Panhandle Pub. Co.,* 149 Tex. 87, 228 S.W.2d 499, 505 (1950).

Of the ten statements that the trial court found defamatory per se, Chad made six of those statements in letters to the Phillipses, while four appeared on the web site or posters. Chad argues that a qualified privilege protects his communication with the Phillipses because both he and they had an interest "sufficiently affected by the communication." The Phillipses obviously had an interest, Chad suggests, in whether Kirk had the right to sell them a mausoleum and whether any other Burbage family members objected to interring the Phillipses at the family cemetery. Chad contends that the court of appeals erred when it found the letter unprotected by the "common-interest privilege"; specifically, Chad objects to the court of appeals' suggestion that "antithetical" interests cannot form the basis for a qualified privilege. 2011 WL 6756979, at *9. While the court of appeals seized on the "common-interest" language, which Chad sometimes used in briefing, our case law identifies the affirmative defense at issue here as qualified privilege.[2]

---

**2.** *Compare Cain,* 878 S.W.2d at 582 (privileg-  ing communication when made *"in good faith*

**[6]** The trial court submitted the ten statements—four unprivileged and six potentially privileged—for the jury to determine if each statement was substantially true at the time it was made. On damages, the trial court submitted broad-form questions that incorporated the jury's answers for all ten statements. If the qualified privilege applied to any statements, then, the broad-form damages questions incorporated both valid and invalid bases for liability. Such commingling may result in harmful error. *Cf. Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 388 (Tex.2000) (reversing for new trial due to erroneous commingling of valid and invalid liability theories in a single broad-form liability question). To obtain reversal due to such a charge error, Chad must have preserved the error at trial. *In re B.L.D.,* 113 S.W.3d 340, 349 (Tex.2003) ("[A]ny complaint to a jury charge is waived unless specifically included in an objection."). We now turn to this preservation question.

**B. Preservation of Charge Error**

The court of appeals held that Chad waived any claim of error in the submission of potentially privileged statements because he "did not object in the trial court to the submission of broad-form damages questions." 447 S.W.3d at 300–01 (citing *In re B.L.D.,* 113 S.W.3d at 349). In *In re B.L.D.,* we held that the court of appeals erred by reviewing a jury charge complaint when the parties did not object at trial to the form of submission. 113 S.W.3d at 349, 355. Chad suggests that this case differs because he raised an objection on qualified privilege, which preserved error in any derivative damages

and the author, the recipient or a third person, or one of their family members, has an interest that is sufficiently affected by the communication"), *with* RESTATEMENT (SECOND) OF TORTS § 596 (1977) (describing the common-interest privilege, which arises when

question. Kirk responds that Chad must specifically object to the damages question's form, not merely to the underlying liability issue. Kirk further argues that even Chad's qualified privilege objection failed to preserve error.

**1. Charge Error Based on Valid and Invalid Liability Theories**

**[7]** "It is fundamental to our system of justice that parties have the right to be judged by a jury properly instructed in the law." *Casteel,* 22 S.W.3d at 388. Thus, in *Casteel,* we required a new trial when a timely and specific objection preserved the issue of erroneous commingling of valid and invalid theories of liability in a broad-form liability question, such that the appellate court could not determine whether the jury based its verdict on an improperly submitted theory. *Id.* (citing TEX.R.APP. P. 61.1). Extending this principle in *Harris County v. Smith,* 96 S.W.3d 230, 234 (Tex. 2002), we determined that a broad-form damages submission mixing valid and invalid elements of damages created the same type of harmful error. And in *Romero v. KPH Consolidation, Inc.,* 166 S.W.3d 212, 225 (Tex.2005), where evidence supported the jury's negligence finding but *not* its malicious credentialing finding, we held that the trial court committed harmful error by submitting an apportionment question which allowed the jury to consider malicious credentialing. We explained that "[e]ven if the jury *could* still have made the same apportionment of fault [without considering malicious credentialing], the error in the question is nevertheless reversible because it effectively prevents [the appellant] from com-

"circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know").

plaining on appeal that they *would not* have done so." *Id.* at 226.

[8] We continue to adhere to these principles. Yet in addition to the common animating principle of properly instructing the jury in the law, these cases share another link: *some* timely and specific objection. *Romero,* 166 S.W.3d at 229; *Harris Cnty.,* 96 S.W.3d at 232; *Casteel,* 22 S.W.3d at 387. In other words, in situations where a party does not raise a *Casteel*-type objection, that party surely cannot raise a *Casteel* issue when it failed to preserve a claim of an invalid theory of liability that forms the basis of a *Casteel*-type error. If we allowed litigants to raise a *Casteel* issue with no valid objection, either to liability or submission form, those litigants could use a post-trial motion to raise a lack of evidence on the liability question, thus bypassing the crucial step of allowing the trial judge to correct any errors in the charge.

In *Romero,* we declined to address whether the appellant must object both to the lack of evidence to support submission of a jury question *and* the form of the submission, because in that case the appellant did both. 166 S.W.3d at 229 & n. 55 (acknowledging the difficult question of whether an additional broad-form objection is required) (citing *Pan E. Exploration Co. v. Hufo Oils,* 855 F.2d 1106, 1124 (5th Cir.1988)). But whether or not an objection to *both* is required, *some* timely and specific objection must raise the issue in the trial court. *See Thota v. Young,* 366 S.W.3d 678, 691 (Tex.2012) (requiring "some objection to the charge," whether to evidentiary support or to form, to preserve error for appellate review). Here, Chad objected based on qualified privilege, but he made no objection to the form of submission. If Chad's initial objection on qualified privilege did not preserve error,

we need not address whether a further *Casteel*-type objection is required.

#### 2. Specific Objections

[9] Our rules of procedure establish the preservation requirements to raise a jury-charge complaint on appeal. *Id.* at 689. The complaining party must object before the trial court and "must point out distinctly the objectionable matter and the grounds of the objection." Tex.R. Civ. P. 274; *see also* Tex.R.App. P. 33.1. Under Rule of Civil Procedure 274, "[a]ny complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." Tex.R. Civ. P. 274. As a general rule, preservation requires (1) a timely objection "stating the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context," and (2) a ruling. *See* Tex. R.App. P. 33.1. Stated differently, the test ultimately asks "whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling." *State Dep't of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992).

[10] Importantly, the "purpose of Rule 274 is to afford trial courts an opportunity to correct errors in the charge by requiring objections both to clearly designate the error and to explain the grounds for complaint." *Wilgus v. Bond,* 730 S.W.2d 670, 672 (Tex.1987); *see Payne,* 838 S.W.2d at 243 (Mauzy, J., dissenting) ("Only by proper objection does a litigant afford the trial court sufficient opportunity to correct defects in the charge."). We apply these rules to Chad's objection.

#### 3. Chad's Objection

The following dialogue occurred at the formal charge conference:

Mr. Cagle:[3] I'm not sure if this is an objection. I apologize, Your Honor. But the matter of in the amended— defendant's amended—first amendment to the original response, defendant has requested that there be a qualified privilege relative to the letter, and the reason for the qualified privilege is it represents common interests, a continuation of a prior judicial proceeding in Maryland and a continuation of trying to resolve matters of mutual concern between the parties of the cemetery.

The Court: All right. Do you have a requested instruction that you're asking the Court to consider and to include in the charge?

Mr. A. Burbage: I have—it seems as though it would—it would require the— a question in the line after—after you find that the statement inflammatory, then there would be a question do you find the statement blah-blah-blah was false at the time it was made as it related to—

The Court: All right. Anything further on that? On that particular issue is there anything further?

Mr. A. Burbage: No. It was—it's been mentioned in the testimony.

The Court: All right. The objection is overruled. The requested instruction is denied.

**[11, 12]** Chad claims that the trial court erred in submitting liability questions on the potentially privileged statements. Therefore, Chad's objection needed to communicate to the trial court that it was improper to submit Questions 5 through 10 (on statements in the Phillips letters) to the jury. The objection does raise the subject of the qualified privilege. But, crucially, the objection must apprise the trial court of the error alleged such that the court has the opportunity to correct the problem. *See Wilgus,* 730 S.W.2d at 672. When the trial court asked Chad whether he had a requested instruction, Chad responded only with a request for a question that appears to address the falsity of the statements themselves. As Chad has argued, a qualified privilege may still apply even when the statements are false. *See O'Neil,* 456 S.W.2d at 898. It is unclear what Chad hoped to accomplish by requesting an additional question if he wanted the court to withhold Question 5 through 10 from the jury.[4] And it is uncertain even to which questions Chad referred (presumably Questions 5 through 10, but the word "inflammatory," which Chad uses to describe the placement of his proposed question, appears nowhere in the charge). Quite simply, Chad has not provided a specific objection indicating the alleged error in the charge and allowing

---

**3.** The record states that Mr. Cagle, Kirk's attorney, initially made the objection. The reproduction in Kirk's brief on the merits instead attributes the objection to Chad. Indeed, it makes more sense in context that Chad made the initial objection. We decline to attach importance to this potential record error because we find either objection insufficient to preserve error.

**4.** We cannot safely engage in assumptions about what Chad might have meant. Whether the statements were false and Chad knew of their falsity—compared with the jury's actual finding that the statements were not substantially true—would have relevance to the

question of whether Chad acted with actual malice. But the trial court gave the incorrect common law definition of malice, Chad did not object to the incorrect malice definition, and, as Chad argues, the burden on actual malice falls to Kirk, not Chad. Such a confusing objection, raised during the crucial charge conference, could not have apprised the trial judge that Chad objected to the submission of the offending questions. Chad explained his desire more coherently at a hearing on his request for findings of fact and conclusions of law, but at that point it was too late.

the trial court the opportunity to correct the error.

We note that when Chad wanted to object to a specific question at the charge conference, he did so. *Before* the objection on qualified privilege at issue here, Chad objected to Question 10 because it duplicated elements of Questions 7 and 8. The trial court initially sustained this objection (although it reversed that ruling at the end of the charge conference). Chad's objection to qualified privilege, in order to preserve error, needed to distinctly raise the issue of withdrawing Questions 5 through 10 from the jury. By its language, it does not do this. And it would make little sense for Chad to raise an objection to qualified privilege to eliminate Questions 5 through 10 when, only moments before, he eliminated Question 10 only because it was duplicative of Questions 7 and 8, *not* because the Questions 7 and 8 were improper to submit to the jury. With this in mind, we cannot conclude that Chad's intent to remove Questions 5 through 10 was "apparent from the context." Tex.R.App. P. 31.1(a)(1)(A). We hold that Chad's objection was insufficiently specific and did not preserve his claim of error in the submission of Questions 5 through 10.

**[13–16]** Our procedural rules are technical, but not trivial. We construe such rules liberally so that the right to appeal is not lost unnecessarily. *Arkoma Basin Exploration Co. v. FMF Assocs. 1990–A, Ltd.,* 249 S.W.3d 380, 388 (Tex.2008). But when an objection fails to explain the nature of the error, we cannot make assumptions. Preservation of error reflects important prudential considerations recognizing that the judicial process benefits greatly when trial courts have the oppor-

tunity to first consider and rule on error. *In re B.L.D.,* 113 S.W.3d at 350 (citing *In re C.O.S.,* 988 S.W.2d 760, 765 (Tex.1999)). Affording courts this opportunity conserves judicial resources and promotes fairness by ensuring that a party does not neglect a complaint at trial and raise it for the first time on appeal. *Id.* (citing *Pirtle v. Gregory,* 629 S.W.2d 919, 920 (Tex.1982) (per curiam)). Nor may we stray from these rules because Chad represented himself at trial. *See Mansfield State Bank v. Cohn,* 573 S.W.2d 181, 184–85 (Tex.1978).

#### 4. Application

Chad argues that the court impermissibly combined valid and invalid theories of liability when the broad-form damages question incorporated privileged statements. Chad did not make a *Casteel*-type objection to form; thus, to preserve error, Chad *must* have raised some specific objection to the submission of Questions 5 through 10. *See In re B.L.D.,* 113 S.W.3d at 349–50 (holding that a complaint to a jury charge was waived because it was not specifically included in an objection). He did not. Thus, we hold that Chad's failure to object waives his right to complain of the charge on appeal.

### III. Damages

We next consider the jury's compensatory and exemplary damage awards. The jury awarded Kirk and the Burbage Funeral Home $3,802,000 in compensatory damages and $5,800,000 in exemplary damages, but the court of appeals reduced exemplary damages to $750,000.[5] After reviewing the record, we hold that no evidence supports the amount of compensato-

---

**5.** Chad does not specifically challenge the $2,000 awarded as mental anguish damages.

Therefore, we do not address those damages.

ry damages and, consequently, exemplary damages cannot stand.

### A. Compensatory Damages

Chad argues that the jury's $3.8 million award lacks evidentiary support and offends the First Amendment. Specifically, Chad contends that the $3.5 million awarded for *future* damages punishes Chad for his speech, rather than fairly compensates Kirk for his injury. Kirk responds that Texas law presumes damages for defamatory per se statements and ample evidence supports the jury's awards. Kirk suggests that trust-based businesses like funeral homes suffer greatly from the mere insinuation of unseemly acts. Further, Kirk argues that non-media defendants like Chad fail to present the same First Amendment concerns as media defendants.

[17–20] Our legal-sufficiency review standards are well established. On an issue where the opposing party bears the burden of proof, we sustain a legal-sufficiency challenge to an adverse finding if our review of the evidence demonstrates a complete absence of a vital fact, or if the evidence offered is no more than a scintilla. *See Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.,* 434 S.W.3d 142, 156 (Tex.2014). More than a scintilla exists when the evidence would enable reasonable and fair-minded people to reach different conclusions. *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004). We regard evidence that creates a mere surmise or suspicion of a vital fact as, in legal effect, no evidence. *Id.* We consider the evidence in the light most favorable to the judgment, "crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller v. Wilson,* 168 S.W.3d 802, 807 (Tex.2005).

[21, 22] Texas law presumes that defamatory per se statements cause reputa-

tional harm and entitle a plaintiff to general damages such as loss of reputation and mental anguish. *Bentley v. Bunton,* 94 S.W.3d 561, 604 (Tex.2002) (plurality opinion). But this presumption yields only nominal damages. *See Salinas v. Salinas,* 365 S.W.3d 318, 320 (Tex.2012) (per curiam). Beyond nominal damages, we review presumed damages for evidentiary support. *See Hancock v. Variyam,* 400 S.W.3d 59, 66 (Tex.2013).

[23–25] In addition to the legal sufficiency of evidence, we have recognized an imperative that appellate courts determine whether any evidence supports the *amount* of jury damages. *See Bentley,* 94 S.W.3d at 606. In *Bentley,* a judge sued for defamation after a call-in talk show host repeatedly made on-air imputations of corruption. *Id.* at 566–67. The jury assessed $7 million in damages for mental anguish and $150,000 in reputation and character damages. *Id.* at 605. We recognized that the inherent difficulty in quantifying such noneconomic damages necessarily allows the jury latitude. *Id.* Yet this latitude has limits; latitude does not "give [the jury] carte blanche to do whatever it will, and this is especially true in defamation actions brought by public officials." *Id.* Even in a case outside the realm of media defendants and public officials, judicial review of jury discretion remains important to protect free speech. *See id.* We must ensure that noneconomic damages compensate for *actual* injuries and are not simply "a disguised disapproval of the defendant." *Id.; see also Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ("[T]he private defamation plaintiff who establishes liability under a less demanding standard than [knowledge of falsity or reckless disregard for the truth] may recover only such damages as are sufficient to compensate him for actual injury.").

Before turning to the evidence, we must delimit our review. The jury charge sets the standard. *See Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."). Questions 11 and 12 asked what sum of money "would fairly and reasonably compensate" for injuries sustained. The trial court instructed the jury that "[y]ou must make a finding of at least nominal damages for injury to reputation in the past." In response, the jury awarded $300,000 to Kirk and the Burbage Funeral Home. But on *future* reputation damages, the court instructed the jury to determine the appropriate compensation for injury "that, in reasonable probability, [Kirk] will sustain in the future" (and did not require the jury to find at least nominal damages). The jury awarded a combined $3.5 million in response. We must conduct a meaningful appellate review of the jury's determination of an amount that "would fairly and reasonably compensate" for the loss.

With these principles in mind, we turn to the evidence. Chad and Kirk vigorously disagree about the defamation's effect on the Burbage Funeral Home's business. The court of appeals upheld the large compensatory damage award in part because the funeral home "had a market value of at least $3 million and … this value would likely be lost because of Chad's statements." 447 S.W.3d at 302. The court stated that Kirk was not required to substantiate the value with documentary evidence. *Id.*

[26] Although we agree that the jury generally has broad latitude in determining damages, we find no evidence of actual injury in the record. To begin, we cannot credit the purported value of the funeral home business (leaving aside that this does not reflect actual damage to reputation). Kirk reluctantly offered a questionable estimate of the funeral home's value:

Q. If you sold the funeral home today, what would the value of that funeral home be—of the business, as an ongoing business?

A. I never had any intention nor do I have any interest in selling the funeral home, so I never really—if I had to throw something out there and just—this is just from experience with hearing about other firms, but I don't—I don't really know. I'd say a few million dollars.

This estimate is practically and linguistically troubling. Practically speaking, Kirk admits in the previous sentence that he does not know the value, and the phrase "if I had to throw something out there" qualifies his response. We require *some* concrete basis for an estimate. *Cf. Nat. Gas Pipeline Co. of Am. v. Justiss,* 397 S.W.3d 150, 159–61 (Tex.2012) (concluding that speculative and conclusory testimony, lacking in demonstrable factual explanation, could not support an award of damages based on diminished market value of a home in a permanent nuisance claim). And Kirk's language adds ambiguity. How many is a few? The court of appeals interprets this as at least $3 million, but this is not clear: definitions of "few" vary. *See, e.g.,* AMERICAN HERITAGE COLLEGE DICTIONARY 505 (3d. ed.2000) ("[b]eing more than one but indefinitely small in number"); RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE 712 (2d. ed.1987) ("not many but more than one"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 843 (1961) ("not many persons or things").

We recently addressed an analogous situation in *Waste Management of Texas, Inc. v. Texas Disposal Systems Landfill, Inc.,* 434 S.W.3d 142 (Tex.2014). In that case, the key evidence of injury to Texas

Disposal Systems' reputation was its CEO's testimony estimating the value of its reputation at $10 million, and three exhibits purportedly supported that testimony. *Id.* at 160. The exhibits estimated lost profits and evidenced a decrease in "base business." *Id.* First, we held that damages such as lost profits "are not the sort of general damages that necessarily flow from such a defamatory publication." *Id.* Then, we stated that the "evidence must support the amount awarded by the jury; it must not be an 'indicator' that supports the estimates offered by the corporate executive." *Id.* Turning to this case, Kirk provided even less evidence than the "indicators" we found insufficient in *Waste Management.* Kirk's ballpark estimate of the Burbage Funeral Home's value does not equate to evidence of actual damages for injury to the business's reputation.[6]

The record contains only speculative evidence that the value, if established, "would likely be lost," as the court of appeals found. *See* 447 S.W.3d at 302. Questioned

whether the defamation could destroy the funeral home's reputation, Kirk said: "[P]otentially. In my opinion." Kirk said the value would be "zero" only when questioned on what would happen if the funeral home was "run out of business." Keith, Kirk's brother, testified that, in a small community, such allegations "can ruin that entire business." A theoretical possibility, however, is a far cry from a likely event.

Similarly speculative evidence supports the actual impact on the funeral home. Kirk testified that some customers, including customers with previous business at the funeral home, cancelled pre-paid contracts:

Q. Since these allegations have been made, have you had people who have cancelled those?

A. Yes, I have.

Q. Even as recently as last week?

A. Yes, sir.

Q. Have you ever asked them why they're cancelling it?

---

**6.** Furthermore, the purported evidence on the value of the business blurs the lines between the torts of business disparagement and business defamation. In *Waste Management*, we noted "the similarity between the two claims, but that one difference is that one claim seeks to protect reputation interests and the other seeks to protect economic interests against pecuniary loss." 434 S.W.3d at 155 (citing *Forbes, Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex.2003)). The publication at issue in that case was defamatory of the *owner* of the business, and not the landfill-services business *itself*. *Id.* at 150–51 n. 35. In other words, defamation injures the reputation of the owner, not the owner's business. *Id.* In a defamation per se claim, general damages are presumed, while special damages are not; special damages, on the other hand, are an essential element of a business disparagement claim. *Id.* at 155. We distinguish between "general damages (which are non-economic damages such as for loss of reputation or mental anguish) and special

damages (which are economic damages such as for lost income)." *Hancock v. Variyam*, 400 S.W.3d 59, 65 (Tex.2013).

Turning back to this case, Kirk seems to seek damages to the business, rather than damages for loss of the business's reputation. This fine distinction matters. If Kirk desired damages to protect the economic interests of the Burbage Funeral Home, a business disparagement claim provides the correct vehicle. *See Forbes*, 124 S.W.3d at 170. And, whether under defamation or business disparagement, we require a plaintiff requesting special damages to prove those damages. *See Hancock*, 400 S.W.3d at 66. Here, the type of damages Kirk seeks, economic damages, are distinct from the noneconomic damages that are presumed in a defamation per se case. Kirk did not plead these special damages and certainly has not proven them. Kirk could have brought business disparagement or defamation claims (or both), but in any case his proof will not suffice for recovery of special damages.

A. Couldn't bring myself to.

Q. Are you afraid its because of these accusations?

A. Yes.

In *Hancock v. Variyam,* a doctor claimed that the submission of a defamatory letter to an accrediting body, which later denied the doctor accreditation, provided evidence of reputation damages. 400 S.W.3d at 70. This Court held that "a jury may not reasonably infer an ultimate fact from 'meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.'" *Id.* at 70–71 (quoting *Hammerly Oaks, Inc. v. Edwards,* 958 S.W.2d 387, 392 (Tex. 1997)). Similarly, the jury cannot reasonably infer that defamation caused the cancellations when the cancellations could have occurred for any number of reasons. Indeed, Kirk admitted that he did not ask why the customers cancelled, only that he was "afraid" it was because of accusations.

Some evidence does suggest community awareness of and discussion of Chad's statements. And Chad, in earlier menacing letters, suggested that the statements would have "significant repercussions." But in terms of *actual* impact of the defamation—the basis for which the damage award compensates—Kirk offered only vague testimony:

Q. How would you say that these accusations have affected your reputation in the community? Do you still have one?

A. I'd like to think that I do. I'd like to think that there's those people that know me and—that truly know me and that they're going to give it credence. Sure, they're going to listen up, because they'd be stupid not to, but I'd like to believe that— you know, that it—that it doesn't affect everybody. I'd like to believe that.

Q. But you don't know.

A. No, I don't know.

Kirk's mother, Virginia, when asked about the impact on the Burbage family name, said "I'm sure it could hurt some, but I think most people would not believe it." Further, Kirk's testimony undermines the scope of the impact on him, personally:

Q. You don't advertise with your photo anywhere or your name anywhere?

A. No, sir.

Q. Have there been any newspaper articles about you in conjunction with the funeral home or community service?

A. Not that I can recall anyway.

Q. Are you the only funeral director there at the Burbage Funeral Home?

A. No. There are three others.

Q. Are you—are you—Anna Burbage was the face of the Burbage Funeral Home; is that right?

A. In her lifetime.

Q. Are you considered the face of the Burbage Funeral Home?

A. I don't know if I would be considered the face because I don't meet with a lot of the families any more unless it's a family that I know. That's what I have the other directors to do. I'm a lot more behind the scenes.

[27]    The court of appeals distinguished *Bentley* as a public-official case. 447 S.W.3d at 301. While the concern for baseless jury awards has stronger resonance in public-official cases, such concerns are not absent here. The evidence does not show actual loss of reputation, that anyone believed the defamation, that the Burbage Funeral Home suffered an actual loss, or even the funeral home's actual value. On the record here, we hold

that no evidence supports the jury's award of $3.8 million in actual damages. We reverse the judgment of the court of appeals in part.

### B. Exemplary Damages

[28] A party may not recover exemplary damages unless the plaintiff establishes actual damages. *Hancock,* 400 S.W.3d at 71. Because we hold that no evidence supports the jury's award of actual damages, exemplary damages are not available. *See id.*

### IV. Prohibitive Injunction

[29] As part of its final judgment, the trial court permanently enjoined Chad from "publishing, disseminating or causing to be published or disseminated, . . . to third-parties by any means, . . . any statement or representation that states, implies or suggests in whole or part" any of four pages of forbidden topics. The injunction tracks the language of the ten defamatory statements, and for many statements the injunction lists numerous ways Chad may run afoul of the court's order. For instance, Chad may not assert that he or *any* third party suffered from *any* of Kirk's selfish, greedy, or unlawful actions. This extraordinarily broad prohibition on future speech need not detain us long. Prohibitive injunctions of future speech that is the same or similar to speech that has been adjudicated to be defamatory operate as impermissible prior restraints on free speech.[7] *Kinney v. Barnes,* 443 S.W.3d 87, 92–93 (Tex.2014). Under *Kinney,* the trial court's prohibitive injunction cannot stand. Therefore, we affirm that part of the court of appeals' judgment.

### V. Conclusion

Chad failed to preserve for appeal his complaint of the jury charge; thus, we do not reach whether a qualified privilege protected any of Chad's statements. We therefore affirm in part the court of appeals' judgment. We do, however, hold that no evidence supports the jury's award of compensatory damages, and that exemplary damages cannot stand. We reverse that part of the court of appeals' judgment and render judgment that Kirk and the Burbage Funeral Home take nothing as compensatory and exemplary damages on their defamation claims. *See MBM Fin. Corp. v. Woodlands Operating Co., L.P.,* 292 S.W.3d 660, 666 (Tex.2009) (recognizing that "where the record shows as a matter of law that the plaintiff is entitled only to nominal damages, the appellate court will not reverse merely to enable him to recover such damages" and instead rendering a take-nothing judgment). However, we do not reach mental anguish damages because Chad made no challenge in this Court. Finally, we hold that the prohibitive injunction impermissibly restrains speech; therefore, we affirm that part of the court of appeals' judgment.



---

**7.** A mandatory injunction requiring the removal or deletion of posted speech that has been adjudicated defamatory is not a prior restraint on speech. *Kinney v. Barnes,* 443 S.W.3d 87, 89 (Tex.2014). But here the injunction did not require Chad to remove or delete any previously-made defamatory statements. Although Chad published several defamatory statements to his website and on posters, the website was only operative for approximately four months and the posters had been removed by trial.